**Theodore Robert BUNDY, Petitioner,**

v.

**Richard L. DUGGER, Respondent.**

**No. 86–968–CIV–ORL–18.**

United States District Court,
M.D. Florida,
Orlando Division.

Dec. 22, 1987.

---

James E. Coleman, Jr., Polly J. Nelson, Wilmer, Cutler & Pickering, Washington, D.C., for petitioner.

Gregory Costa, Andrea Hillyer, John Koenig, Jr., Mark Menser, Dept. of Legal Affairs, Tallahassee, Fla., for respondent.

## ORDER

GEORGE KENDALL SHARP,
District Judge.

This case is before the Court pursuant to the mandate of the Eleventh Circuit Court of Appeals in *Bundy v. Dugger*, 816 F.2d 564 (11th Cir.1987). On November 17, 1986 this Court entered an Order rejecting the claim of the Petitioner, Theodore Robert Bundy, that he was incompetent to stand trial for the first degree murder of Kimberly Diane Leach in Lake City, Florida. In addition, this Court denied the Petitioner's request for an evidentiary hearing to determine his mental state at the time of the Leach murder trial because Petitioner failed to present sufficient evidence raising a legitimate doubt as to his competence to stand trial. On appeal, however, the Eleventh Circuit Court of Appeals reversed the decision of this Court and held:

> [T]he district court erred in denying a hearing on the ground that, because Bundy did not raise this claim at trial, granting him a hearing now would be a "perversion of justice." A defendant cannot waive his right not to stand trial if he is incompetent. Thus, a defendant can challenge his competency to stand trial for the first time in his initial habeas petition and, if he presents facts raising a legitimate doubt as to his competency to stand trial, he is entitled to an evidentiary hearing in the district court. (citations omitted).

> We do not suggest in any way, however, that Bundy was incompetent to stand trial. That determination can be made only after a full and fair evidentiary hearing. We hold simply that the district court's finding that Bundy failed to present evidence sufficient to warrant an evidentiary hearing on his competency to stand trial is clearly erroneous.[1]

*Bundy v. Dugger*, 816 F.2d at 567–68.

Accordingly, this Court conducted an evidentiary hearing which lasted five days,

---

1. The Eleventh Circuit Court of Appeals found that this Court rejected strong indicia of Petitioner's incompetence to stand trial, including the psychological report of Dr. Tanay which

beginning October 22, 1987 and continuing on December 14 through 17, 1987. The limited issue before this Court is whether the Petitioner, Theodore Robert Bundy, was competent to stand trial for the first degree murder of Kimberly Diane Leach in Lake City, Florida.

### 1. Legal Standard

"A defendant is mentally incompetent to stand trial if he lacks a 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding' and if he lacks 'a rational as well as factual understanding of the proceedings against him.'" *Bundy v. Dugger*, 816 F.2d at 565–66 (quoting *Dusky v. United States*, 362 U.S. 402, 402, 80 S.Ct. 788, 789, 4 L.Ed.2d 824 (1960)). In addition, Florida Rule of Criminal Procedure 3.211(1) sets forth several criteria which must be considered when pondering the issue of competence to stand trial:

(1) In considering the issue of competence to stand trial, the examining experts should consider and include in their report, but are not limited to an analysis of the mental condition of the defendant as it affects each of the following factors:

(i) Defendant's appreciation of the charges;

(ii) Defendant's appreciation of the range and nature of possible penalties;

(iii) Defendant's understanding of the adversary nature of the legal process;

(iv) Defendant's capacity to disclose to attorney pertinent facts surrounding the alleged offense;

(v) Defendant's ability to relate to attorney;

(vi) Defendant's ability to assist attorney in planning defense;

(vii) Defendant's capacity to realistically challenge prosecution witnesses;

(viii) Defendant's ability to manifest appropriate courtroom behavior;

(ix) Defendant's capacity to testify relevantly;

(x) Defendant's motivation to help himself in the legal process;

(xi) Defendant's capacity to cope with the stress of incarceration prior to trial.

The criteria used by experts to determine competency is not always the same. Consequently, Florida Rule of Criminal Procedure 3.211(1), addresses those factors which should be considered by experts at both ends of the spectrum. *See* Committee Note to Florida Rule of Criminal Procedure 3.211.

### 2. Merits

At the hearing on Petitioner's claim of incompetency to stand trial, Petitioner presented the expert testimony of Psychiatrist Dorothy Lewis. Dr. Lewis opined that the Petitioner suffers from a bipolar mood disorder, better known as manic depressive mental illness. Bipolar mood disorders are characterized by wide changes in mood or mood swings. During the manic phase, the person can be loud, angry and violent or grandiose. At the other extreme, the person would experience periods of extreme depression.

In support of her theory, Dr. Lewis described several instances of supposedly irrational or bazaar behavior. For example, Dr. Lewis testified that there were instances during the Petitioner's childhood when he would place knives in the beds of other family members. According to Dr. Lewis, such behavior was bizarre for a three-year-old child and suggested that Petitioner may have been seriously traumatized as a youngster. Dr. Lewis opined that perhaps the Petitioner's grandfather, an allegedly violent person, had traumatized the Peti-

suggests that Petitioner was incompetent to stand trial. In addition, the Eleventh Circuit Court was impressed by several instances in which Petitioner ignored the advice of his attorneys by giving statements to police, and reneging on a plea agreement which would have saved Petitioner's life. The Appellate Court also found that conducting a wedding ceremony during the penalty phase of the trial may be indicative of incompetency. Though these instances of supposedly irrational conduct, standing alone, do not warrant a finding of incompetency, the Eleventh Circuit believed there was sufficient evidence to warrant an evidentiary hearing. *Bundy v. Dugger*, 816 F.2d at 566–67.

tioner at a very early age. Dr. Lewis also suggested that members of Petitioner's family exhibited symptoms of possible mental illness.

Dr. Lewis also found significance in the Petitioner's college transcripts. According to Dr. Lewis, the Petitioner's ability to function in school fluctuated widely as indicated by periods in which Petitioner would first perform favorably and on other occasions perform unfavorably. Dr. Lewis also characterized a period in Petitioner's life in which he became involved in politics as a hypomanic state.

Based on her research, Dr. Lewis concluded that the Petitioner's mental illness or bipolar mood disorder caused the Petitioner to be mentally incompetent at the time of trial in the Kimberly Leach case. According to Dr. Lewis, Petitioner acted in a grandiose manner throughout the trial and was incapable of communicating with his attorneys or aiding his defense in a meaningful manner. In addition, Dr. Lewis suggested that Petitioner was unable to appreciate the jeopardy he was facing.

On cross-examination, the Court observes that Dr. Lewis could not satisfactorily explain certain data which was inconsistent with her diagnosis of bipolar mood disorder. For example, Petitioner graduated *with distinction* from the University of Washington with a B.S. in psychology. Members of Petitioner's own family could not recall that Petitioner suffered from any depressive episodes. Dr. Lewis admitted that she believed Petitioner would lie on occasion and did lie during the course of several interviews between herself and Petitioner. Finally, Dr. Lewis did not explain in a satisfactory or reasonable manner why she rejected the findings of Dr. Cleckley, Dr. Jorganson and Dr. Carlyle. These physicians believed that Petitioner was not mentally ill. Yet, Dr. Lewis reviewed Dr. Cleckley's report and the reports of Dr. Jorganson and Dr. Carlyle and discounted their findings without a satisfactory explanation.

Dr. Lewis' testimony was also inconsistent and contrary to the observations of the eyewitnesses who observed the Petitioner throughout the trial and pretrial proceedings in the Leach murder case. Dr. Lewis described the Petitioner as being "higher than a kite" during the Leach murder trial in order to illustrate her belief that Petitioner was under a hypomanic state. This opinion, however, is inconsistent with the testimony of Judge Wallace Jopling and State Prosecutor George Dekle. These witnesses observed that Petitioner's behavior was at all times appropriate with the exception of one brief outburst which took place out of the presence of the jury. Further, members of Petitioner's defense team testified that Petitioner was subdued and appeared disinterested in his case. The Court finds, therefore, that Dr. Lewis' opinions are not supported by the evidence as to what actually occurred during the Leach murder trial and pretrial proceedings.

Petitioner also offered the deposition testimony of psychiatrist Emanuel Tanay taken December 14, 1987 in support of Petitioner's claim that he was incompetent to stand trial. Dr. Tanay's impression was that Petitioner was rather intelligent and well informed. However, Dr. Tanay testified that Petitioner suffered from a lifelong personality disorder or psychopathic personality which is characterized by manipulative and destructive behavior. In addition, Dr. Tanay suggested that Petitioner's ability to control his impulses was impaired and that Petitioner involved himself in self-destructive gamesmanship during the course of the Chi Omega murder trial and pretrial proceedings in Tallahassee, Florida. In addition, Dr. Tanay testified that Petitioner did not appreciate the evidence linking him to the crime because Petitioner believed the evidence against him was not compelling and could be overcome.

Dr. Tanay believed that Petitioner's rejection of the plea agreement was not a rational act. According to Dr. Tanay, Petitioner desired to have the proceedings go on in order to satisfy his pathological needs. Also, Petitioner's desire to represent himself was behavior typical for a psychopath guided by a desire for showmanship. Further, Dr. Tanay testified that

he believed Petitioner was unable to appreciate the gravity of the charges against him and the weight of the state's evidence. According to Dr. Tanay, he understood the state's evidence against Petitioner was conclusive of guilt and, for that reason, Petitioner's refusal to recognize that he would undoubtedly be found guilty was irrational.

Dr. Tanay's opinion, however, was inconsistent in several respects. For example, Dr. Tanay admitted that Petitioner was able to comprehend complex legal issues and articulate his thoughts in a meaningful, well organized manner. Also, Dr. Tanay noted that Petitioner was able to converse on a wide variety of subjects in an intelligent manner. Petitioner was also able to intellectually appreciate the charges against him and the possible jeopardy he was facing. Additionally, Petitioner was able to cope with prison life very well.

On cross-examination, Dr. Tanay admitted that his opinion regarding competency to stand trial related to an earlier proceeding in which the Petitioner was charged with the unrelated murders of two female college students in Tallahassee, Florida, popularly known as the Chi Omega murders. Indeed, Dr. Tanay admitted that he had no opinion regarding the proceedings in the Kimberly Leach murder case and that his opinion might change upon examination of subsequent records. Further, Dr. Tanay was unaware of many flaws in the state's case against Petitioner. In fact, Dr. Tanay's opinion concerning Petitioner's competency was based on Dr. Tanay's unrealistic and subjective belief that the evidence against Petitioner in the Chi Omega murder case was overwhelming. Indeed, persons on Petitioner's defense team believed that Petitioner's case was winnable because the state's evidence was not compelling. Further, the state's prosecutor, Jerry Blair, admitted that the state's case against Petitioner for the murder of Kimberly Leach could be lost on the evidence. In addition, Dr. Tanay's opinions were based on his belief that Petitioner had an excellent team of lawyers, a belief clearly not shared by the Petitioner. Finally, the court notes that Dr. Tanay was evasive on cross-examination, and his testimony during the December 14, 1987 deposition was somewhat inconsistent with his earlier deposition concerning the Petitioner's competency to stand trial for the Chi Omega murders.

In rebuttal, the Respondent presented the testimony of Psychiatrist Charles B. Mutter. Dr. Mutter reviewed voluminous records provided by the Respondent at Dr. Mutter's request and instruction. The records which Dr. Mutter reviewed related to Petitioner's conduct at or near the time of his trial for the murder of Kimberly Leach.

Dr. Mutter testified that bipolar mood disorder is a functional disorder which, during manic stages, substantially impairs the person's judgment and ability to function normally. In some instances, almost continual supervision is required in order to prevent physical harm to the person or to others. During depressive episodes there is always some interference in social and occupational functioning. If the impairment is severe, the person may be totally unable to function socially or occupationally, or even to feed or clothe himself or maintain minimal personal hygiene. In addition, suicide is a very real possibility.

After reviewing records which demonstrated Petitioner's ability to function at or near the time of trial in the Leach murder case, Dr. Mutter formed a belief concerning Petitioner's competency to stand trial. In Dr. Mutter's opinion, Petitioner was not incompetent to stand trial. Petitioner experienced some periods of situational anger, stress, and depression but did not appear to be suffering from a bipolar mood disorder. Indeed, Dr. Mutter opined that the absence of situational depression and agitation would be surprising given the grave consequences Petitioner was facing. These would be normal reactions under the circumstances.

Dr. Mutter testified that Petitioner was able to appreciate the nature of the charges against him and the seriousness of the potential jeopardy. This opinion was supported by the Petitioner's argument and actions concerning the discharge of Michael

Minerva as Petitioner's attorney. Specifically, Dr. Mutter noted that Petitioner did not want Minerva to represent him because Minerva did not believe in Petitioner, and wanted to compromise Petitioner's case by pleading guilty or insanity. The request to replace Minerva with someone who did believe in the Petitioner was clearly logical, rational behavior.

According to Dr. Mutter, there was extensive evidence in the record that Petitioner was motivated to help in the defense of his case during the Leach murder trial. For example, Dr. Mutter noted that Petitioner took several depositions during the pretrial stages in order to obtain information which would be helpful to Petitioner's case. Petitioner's arguments at trial were lucid, logically organized, and in most instances compelling. Further, Dr. Mutter noted Petitioner's argument to the trial judge at the beginning of the penalty phase was well organized, persuasive and evidenced a person who was functioning at an exceptional level. Additionally, the pleadings and motions prepared by Petitioner were well organized and presented logical arguments. According to Dr. Mutter, such evidence is wholly inconsistent with a person who suffers from a bipolar mood disorder.

Dr. Mutter did not afford much significance to Petitioner's decision to marry Carol Boone during the penalty phase of the Leach murder trial. According to Dr. Mutter, such an act could easily be viewed as an attempt by Petitioner to gain sympathy from the jury and does not necessarily indicate a mental disorder. According to Dr. Mutter, Petitioner's ability to receive and process information was superior.

Dr. Mutter did concede that Petitioner's decision to represent himself may have been poor judgment on Petitioner's part. However, poor judgment is not indicative of a mental disorder because it is human nature to use poor judgment on occasion. Petitioner's choice to represent himself, according to Dr. Mutter, was therefore a rational choice made after weighing the options available. That is, faced with the trial court's refusal to allow Millard Farm-

er to represent Petitioner, Petitioner believed he could do a better job than Michael Minerva, a person Petitioner believed would compromise the defense of the case by insisting on a guilty plea rather than working toward a not guilty verdict.

On cross-examination, Dr. Mutter admitted that the information he utilized to formulate his opinion was limited to records which showed Petitioner's behavior at or near the time of trial. However, according to Dr. Mutter the records he reviewed were more than adequate for determining the narrow issue before this Court; i.e. Petitioner's competency to stand trial for the murder of Kimberly Diane Leach. Other records relating to periods of time prior to the Kimberly Leach murder trial and pretrial proceedings were simply not germane to the issue of Petitioner's competency at the time of the Leach murder trial. Dr. Mutter believed that there was nothing to indicate that Petitioner was not processing information, and there was nothing to indicate that Petitioner suffered from a bipolar mood disorder.

Dr. Mutter discounted the opinions of Dr. Dorothy Lewis for two principal reasons. First, Dr. Lewis had recently published a study concerning fifteen death-row inmates. In that report Dr. Lewis concluded that the fifteen persons studied suffered from some form or mental illness and, therefore, all persons on deathrow must suffer from some form of mental disease. Consequently, Dr. Mutter viewed Dr. Lewis' report on Petitioner as being suspect or biased. Second, Dr. Lewis' opinion concerning Petitioner's competency to stand trial for the murder of Kimberly Diane Leach was based primarily on Dr. Lewis' research concerning Petitioner's behavior as a child and young adult. Dr. Lewis seemingly ignored Petitioner's ability to function at or near the time of the Leach murder trial. Accordingly, Dr. Mutter believed Dr. Lewis' opinion concerning the narrow issue of competency to stand trial was incomplete.

Psychiatrist Unesh Mhapre also testified on behalf of the Respondent. Like Dr. Mutter, Dr. Mhapre was asked to review

extensive records depicting Petitioner's ability to function at or near the time of the Leach Murder trial and give an opinion concerning Petitioner's competency to stand trial for the murder of Kimberly Diane Leach.

Dr. Mhapre did not interview the Petitioner because such an interview now would be irrelevant to determining the narrow issue of competency to stand trial in 1980. However, Dr. Mutter did interview persons who had extensive contact with Petitioner at or near the time of the Leach murder trial, including, but not limited to, Petitioner's attorney, Vic Africano, state prosecutor Jerry Blair, and the trial judge, Wallace Jopling. In addition, this witness was present in the courtroom throughout the proceedings before this Court.

From his investigation, Dr. Mhapre believed that Petitioner could appreciate and understand the charges pending against him and the possible jeopardy he was facing. From his interview with Vic Africano and review of records, Dr. Mhapre was able to determine that Petitioner related well with his attorneys and was able to help his attorneys in the pretrial and trial phases in a meaningful manner. Dr. Mhapre testified that Petitioner exhibited a good strategic ability and on occasion would recognize flaws in the state's case prior to his own attorneys. As an example, Dr. Mhapre recalled one instance at trial when Petitioner's attorneys were distracted and failed to recognize a potential motion for mistrial when a state witness made reference to Petitioner's earlier murder convictions in the Chi Omega murder trial in Tallahassee, Florida. Petitioner, however, was alert and immediately urged his attorney to object and move for a mistrial.

Dr. Mhapre also considered the possibility that Petitioner suffers from a bipolar mood disorder. According to Dr. Mhapre, Petitioner did exhibit some signs of situational depression, anxiety, and anger at or near the time of the Leach murder trial. In Dr. Mhapre's opinion, however, Petitioner did not display any symptomology of a bipolar mood disorder. Indeed, the depression, anxiety and anger which were present were well within normal limits and constituted appropriate behavior under the circumstances.

In his opinion, Dr. Mhapre believed that Petitioner's concern over his appearance was normal behavior because Petitioner wanted to look good for the jury. Further, such behavior is inconsistent with a finding of bipolar mood disorder where the person actually loses interest in personal hygiene. Similarly, Petitioner's desire to use the telephone was rational behavior under the circumstances. According to Dr. Mhapre, use of the telephone represented access to the outside world or limited freedom. Since Petitioner was incarcerated, such behavior was understandable under the circumstances.

Dr. Mhapre conceded that Petitioner had used bad judgment on occasion. However, bad judgment is not an indicator of mental disease. On occasion, Petitioner performed brilliantly, logically, and in a well organized fashion. Thus, according to Dr. Mhapre, the instances of bad judgment were not indicative of a mental disease or defect. Bad judgment is a part of being human, and not an indicator of mental illness.

Dr. Mhapre conceded that there were instances when Petitioner did not perform well in college. However, according to Dr. Mhapre poor performance in college is not indicative of a mental disease. Poor performance in certain college courses can be attributed as much to the difficulty of the course itself. Further, Dr. Mhapre noted that Petitioner graduated with a degree in psychology from the University of Washington with distinction. Thus, the fact that Petitioner performed poorly in law school and in non-psychology related courses can easily be attributed to the courses themselves.

Dr. Mhapre was also asked to comment on Petitioner's decision to marry Carol Boone during the penalty phase of the Leach murder trial, and Petitioner's decision to reject the plea agreement. Dr. Mhapre recognized that the marriage to Carol Boone was unique. However, the decision to get married could easily have been a strategic ploy to curry sympathy

from the jury. For that reason, Dr. Mhapre believed that the decision to marry Carol Boone during the penalty phase of the trial was not indicative of a mental disease or defect. Similarly, Dr. Mhapre could find nothing illogical or unreasonable about a decision to go to trial and seek a not guilty verdict rather than pleading guilty and spending seventy-five years minimum in prison.

During the course of his testimony, Dr. Mhapre was cautious not to confuse the issue of mental disease with the issue of competency to stand trial. Dr. Mhapre's opinion concerned the narrow issue of Petitioner's competency to stand trial for the murder of Kimberly Leach. In Dr. Mhapre's opinion, a personality disorder or sociopathy would not necessarily make a person incompetent to stand trial. Thus, even if Petitioner does suffer from a bipolar mood disorder, the evidence concerning Petitioner's ability to function at trial and at pretrial proceedings shows that the mental disease did not render Petitioner incompetent to stand trial according to Dr. Mhapre. Indeed, Dr. Mhapre found no evidence that Petitioner suffers from a bipolar mood disorder or any other form of mental disease.

Michael J. Minerva was the first lay witness to testify on behalf of the Petitioner. Michael Minerva was initially appointed to represent Petitioner in the Chi Omega murder trial. According to Minerva, Petitioner refused to consider a mental health defense, ignored Minerva's advice not to speak with police investigators, and ignored Minerva's advice to plead guilty in exchange for three consecutive life sentences which required serving a minimum of seventy-five years in prison. Additionally, Minerva testified that Petitioner chose to represent himself when the trial judge refused to allow Millard Farmer to represent Petitioner at Petitioner's request. Mr. Minerva believed that the Petitioner's actions evidenced that he was incompetent. Accordingly, Mr. Minerva moved for a hearing to determine Petitioner's competency to stand trial in the Chi Omega murder case.

On cross-examination, Mr. Minerva admitted that Petitioner understood his rights and the nature of the proceedings against him. Minerva also admitted that Petitioner's decision to risk death in the electric chair rather than spend the rest of his life in prison could have been a rational choice. Mr. Minerva also pointed out that Petitioner successfully challenged the criteria for use of hypnotically enhanced testimony on direct appeal to the Florida Supreme Court. Finally, Mr. Minerva revealed that other members of the defense team believed that the state's case against Petitioner for the Chi Omega murders was weak.

Petitioner's actions, therefore, could quite properly be characterized as dissatisfaction with Michael J. Minerva's performance rather than incompetence. Michael Minerva clearly did not believe in Petitioner's case, a belief not shared in by other members of the defense team. Mr. Minerva appeared more concerned with asserting an insanity or incompetency defense or having Petitioner plead guilty in exchange for a true life sentence rather than attacking the merits of the state's case. Petitioner, therefore, could rationally view Michael Minerva as an adversary. Consequently, this Court finds that Petitioner's decision to represent himself was not irrational or illogical under the circumstances. Finally, the Court notes that there is nothing unusual or uncommon about a criminal defendant speaking with investigators against the advice of an attorney.

Edward Harvey was assigned to assist Petitioner as stand-by counsel. Mr. Harvey testified that he questioned Petitioner's competency because Petitioner questioned the significance of the state's evidence in the Chi Omega murder case. In addition, Mr. Harvey challenged Petitioner's ability to act as his own attorney. Other members of the defense team, including Don Kennedy and Lynn Thompson, also made similar observations with respect to Petitioner's abilities as a lawyer.

The Court recognizes that any layman's ability to represent himself or herself in a criminal proceeding is clearly limited when compared to the ability of a trained attor-

ney. In that regard the Court notes the often quoted maxim that a person who acts as his own lawyer has a fool for a client. However, Petitioner's competency to act as his own attorney is not an issue in this case, and does not impact upon the question of Petitioner's competency to stand trial in the Leach murder case. In addition, the Court notes that there were instances in which Petitioner actually performed better than his own trial attorneys. For example, as the Court previously pointed out, during the Leach murder trial Petitioner's attorneys were preoccupied with other matters when objectionable testimony was presented through a state witness. Petitioner, however, was alert and urged his attorneys to object and move for mistrial when a reference was made to Petitioner's murder convictions in the Chi Omega case. Further, trained lawyers who were also members of the defense team, seriously questioned the strength of the state's evidence against Petitioner. Accordingly, this Court cannot find that Petitioner's questioning of the strength of the state's case was indicative of incompetence.

Other defense team persons having contact with the Petitioner at or near the time of the Leach murder case were Joseph M. Nursey, Don R. Kennedy, Lynn Thompson, and Michael Corin. These witnesses testified that Petitioner was very articulate and could relate information well if Petitioner so desired. However, these witnesses also testified that Petitioner, on occasion, would refuse to communicate with counsel even though Petitioner had the ability to do so. The Court notes, however, that there is nothing unusual or uncommon about a client's refusing to cooperate with his attorneys. *See, e.g., Jones v. Wainwright,* 604 F.2d 414, 416 (5th Cir.1979) (a defendant may partially waive his right to counsel by *refusing to communicate with counsel*).

George Dekle was the person responsible for prosecuting Petitioner for the murder of Kimberly Leach. Mr. Dekle testified that he had the opportunity to view the Petitioner's conduct on a daily basis throughout the trial and pretrial proceedings. Dekle stated that Petitioner's performance during the pretrial proceedings was exceptional for a layman. For example, Mr. Dekle testified that Petitioner's questioning of witnesses during deposition was effective and well organized. In addition, certain pretrial motions concerning the state's use of fiber evidence were well written and well thought out. When questioned about Petitioner's decision to marry Carol Boone during the penalty phase of the Leach murder trial, Mr. Dekle stated that he believed this was an unfair attempt to curry sympathy from the jurors.

Mr. Dekle viewed Petitioner's conduct during the plea hearing as an attempt to lay the groundwork for future attacks on the voluntariness of the guilty pleas. Consequently, Mr. Dekle withdrew the state's offer to accept the Petitioner's guilty plea in exchange for three life sentences. Once the plea negotiations fell through, Petitioner appeared disappointed according to Mr. Dekle. Mr. Dekle also testified that at no time did Petitioner appear to be intoxicated or not in control of his faculties during the course of the Leach murder trial.[2]

The Court, having had the opportunity to judge the demeanor of George Dekle, accepts his observations of the Petitioner's conduct as being logical and consistent with the other evidence presented in this case. Petitioner obviously had a good understanding of the law which is apparent from his citation to relevant case authority during the course of the trial and pretrial proceedings and Petitioner's attendance in law school. It is logical to assume, therefore, that Petitioner was attempting to lay a foundation for future collateral attacks on the voluntariness of his guilty plea when he attacked the competence of his attorney prior to his attempt at entering a guilty plea. This plan, however, backfired when George Dekle recognized what Petitioner was attempting to do and withdrew the state's offer to accept Petitioner's

---

**2.** Mr. Dekle was questioned about whether Petitioner appeared to be intoxicated at any time during the trial or pretrial proceedings because of earlier testimony from defense team members that Petitioner had access to both drugs and alcohol during the Leach murder trial.

guilty plea in exchange for three life sentences. Petitioner's obvious disappointment could therefore be expected.

The decision to marry Carol Boone during the penalty phase could logically be viewed as an attempt to humanize the Petitioner to the jury. Though the marriage was unique, it showed the jury that Petitioner was capable of giving and receiving love. As such, the Court views the marriage to Carol Boone as a calculated risk by Petitioner to obtain sympathy from the jury during the penalty phase in an effort to avoid a jury recommendation of the death penalty.

Dr. Vito Lipkovic was employed as the chief medical examiner for the State of Florida at the time of Petitioner's trials in both the Chi Omega and Leach murder cases. Dr. Lipkovic testified that Petitioner took his deposition in connection with the Leach Murder case. According to Dr. Lipkovic, Petitioner conducted the deposition in a superior manner. Petitioner was very articulate, well mannered, and exhibited an understanding of the evidence and asked orderly, pointed questions. Dr. Lipkovic believed that Petitioner did an excellent job trying to discredit his opinions. Indeed, Dr. Lipkovic testified that Petitioner actually proved one of Lipcovic's opinions concerning fly-larval activity to be wrong. Consequently, Dr. Lipkovic was forced to alter his opinion somewhat.

The Honorable Wallace Jopling presided over the Leach murder trial. Judge Jopling testified that Petitioner appeared before him approximately sixteen to eighteen times prior to trial in order to present argument on various pretrial motions. According to Judge Jopling, Petitioner did not appear to be intoxicated during any of the pretrial or trial proceedings. In addition, Judge Jopling testified that Petitioner actively pursued his case and presented very cogent arguments with citations to relevant case authority. Other than one outburst

when Petitioner exhibited an apparent dissatisfaction with a juror selected to serve on the panel, after all peremptory challenges had been exhausted, Judge Jopling could recall no instance when Petitioner's conduct was inappropriate.[3] Judge Jopling believed that Petitioner presented intelligent, well reasoned, coherent arguments. Judge Jopling also testified Petitioner obviously understood the adversarial nature of the proceedings and was cognizant of the possible jeopardy involved. This observation is supported by Judge Jopling's testimony that Petitioner's strategy was obviously focused on discrediting the reliability and credibility of the state's witnesses. According to Judge Jopling, Petitioner was one of the most intelligent defendants who had ever appeared before him.

Brian T. Hayes acted as Petitioner's attorney during the competency hearing in the Chi Omega murder case. Mr. Hayes observed that Petitioner was very articulate and appeared knowledgeable in the law. In the opinion of Mr. Hayes, Petitioner was competent to stand trial based on his contact with Petitioner and on what he observed of Petitioner's conduct.

Petitioner also took the deposition of James Sewell prior to the Leach murder trial. In Mr. Sewell's opinion, Petitioner was very articulate during the deposition and explored all aspects of Sewell's testimony in a thorough, well organized fashion. Mr. Sewell also testified that Petitioner's ability as a lawyer ranked well with other attorneys who had questioned Sewell in other unrelated cases. Indeed, Mr. Sewell pointed out that Petitioner actually found a weakness in Sewell's testimony of which Sewell was unaware.

Jerry Blair was involved in the prosecution of Petitioner for the death of Kimberly Leach in Lake City, Florida and had contact with the Petitioner on an almost daily basis during the pretrial and trial proceedings. According to Mr. Blair, the state's case

---

3. In regards to Petitioner's outburst, the Court notes that Petitioner waited until the jury had exited the courtroom before making his argument. In addition, there was considerable testimony presented to this Court which suggests that Petitioner's outburst in the courtroom was a planned act designed to win favor from Petitioner's peers on death-row. Finally, from a review of the jury voir dire in the Leach murder case, the Court easily concludes that Petitioner's apparent dissatisfaction with the challenged juror was clearly understandable.

against Petitioner was far from being "air tight." Consequently, Petitioner's decision to test the state's case at trial was not irrational or illogical in Blair's opinion. Mr. Blair also testified that he observed no conduct which would cause him to question Petitioner's competency to stand trial for the murder of Kimberly Leach. The marriage to Carol Boone, in this witness' opinion, appeared to be a reasoned decision to gain sympathy from the jury.

In addition to the foregoing testimony, the Court has reviewed the entire trial transcript of the Leach murder case, as well as numerous depositions taken by the Petitioner. The Court has also reviewed voluminous documents which were prepared by the Petitioner, including legal pleadings and motions and personal letters. The Court also reviewed a video cassette recording of the Petitioner's activities and arguments during the Leach murder trial as well as several tape recorded messages prepared by Petitioner during the course of the Leach murder trial. The Court finds that all the materials prepared by the Petitioner show a person with excellent literary capabilities, superior organizational skills, and an understanding of the law. As an example of Petitioner's excellent writing ability, organizational skills and keen insight for legal issues, the Court directs attention to Petitioner's exhibits # 2, # 20 through # 26, and # 37.

Petitioner's exhibit # 26, a letter dated May 12, 1978 and written by the Petitioner to Bruce Lubeck and John O'Connel, is well drafted and well organized. This document not only reflects a person whose literary skills are superior, but also depicts a person who is well aware of his present situation and the jeopardy he faces. Petitioner's composite exhibit # 37 also contains several letters written by the Petitioner concerning his status as a law school applicant and student. Again, the Court notes that Petitioner's literary skills are notable. Petitioner's letters are not only well organized but very persuasive. These letters clearly reflect an individual who is in touch with reality and cognizant of the law school admissions process.

The Court has also reviewed Petitioner's composite exhibit # 2 titled "Pensacola and Tallahassee Law Enforcement Interviews with Theodore Robe Bundy." The Court is aware that Petitioner agreed to many of these interviews against the advice of his attorneys. However, the Court recognizes from prior experience that criminal defendants quite often will confess to crimes or agree to give a statement to police investigators against the advice of counsel. This, in and of itself, is not an unusual occurrence. Further, there is nothing in exhibit # 2 which indicates to this Court that Petitioner was out of touch with reality. Petitioner's responses to police questions appeared well organized, well thought out, articulate and appropriate responses.

In Petitioner's exhibit # 20, Petitioner wrote a detailed accounting of his alleged whereabouts and activities on the evenings of November 8, 1974 and August 16, 1975. This letter reflects an exceptional ability to recount details as well as a keen literary ability. There is nothing in the letter which would suggest that the writer was out of touch with reality or was unable to receive and process information.

Petitioner's exhibit # 21 is a letter written by Petitioner to Judge Stewart Hansen. In that letter, Petitioner makes an impassioned plea to Judge Hansen to reconsider his decision finding Petitioner guilty of the aggravated kidnapping of Carol Daronch in Salt Lake City, Utah. That letter evidences an appreciation by the writer of the consequences of having been found guilty and the punishment he then faced.

Exhibits # 22 through # 25 are a series of letters authored by Petitioner relating to pending criminal charges in the state of Colorado and the quality of legal representation he would be receiving. These letters reflect that Petitioner understood the nature of the charges pending against him in Colorado and the seriousness of the possible jeopardy. These letters were well organized and exhibited a person with intelligence and keen writing abilities.

The Court has also reviewed Petitioner's college transcripts. Though Petitioner had a habit of withdrawing from courses or of

failing to finish certain coursework throughout his college career, Petitioner's grades reflect a person with above normal intelligence. In law school, Petitioner, like so many other bright students before him, performed poorly during his first semester. However, Petitioner's grades did improve somewhat by the end of his second law school semester.

The Court also reviewed a video cassette recording of Petitioner's closing arguments taken during the penalty phase of the Leach murder trial. Petitioner's arguments were focused, well organized, and compelling.[4] Petitioner's behavior was at all times appropriate, his speech was articulate, and Petitioner appeared to be cognizant of his surroundings and of the jeopardy he was facing.

The Court also listened to ten tape recordings prepared by Petitioner during the Leach murder trial. The tapes prepared by Petitioner were delivered to Stephen Michaud for Michaud's use in writing a book about Petitioner. Stephen Michaud requested Petitioner to record his thoughts concerning the Leach murder trial as well as Petitioner's past recollections concerning childhood through capture in Florida. After listening to the tapes prepared by Petitioner, the Court recognizes that Petitioner followed Michaud's instructions very well by describing in vivid detail past events as well as Petitioner's personal observations about the Leach murder trial. In addition, the Court also notes that Petitioner would record the date, time and place of recording prior to beginning a tape. This attention to detail leads the Court to believe that Petitioner was at all times oriented as to time and place and understood the proceedings which were occurring.

In tapes A, B and C, for example, Petitioner describes his childhood, the home he lived in on Sherridan Street and the school he attended, Stanley Elementary School. Petitioner describes his childhood as being segmented into three distinct areas: family, friends and school. The tapes are reasonably well organized in that Petitioner separates his discussions about his childhood memories into the three areas Petitioner described: school, family and friends.[5]

In tapes D and E Petitioner recounts his extradition from the state of Utah by describing in detail the events leading up to his extradition and the car ride to Colorado to face a charge of murder for the death of Karen Campbell. Petitioner recalls how he was pleased about the extradition because security would not be as tight at the Colorado jail, and an escape opportunity would undoubtedly present itself. In addition, Petitioner recognized that there was some evidence in the form of a credit card receipt which placed Petitioner near the place of the murder at the time of the murder of Karen Campbell in Colorado. Petitioner also recognized weaknesses in the prosecution's case, including a misidentification by the prosecution's star witness. Petitioner also exhibited a knowledge concerning Colorado law when he described how he motioned for discovery of documents in the possession of the prosecution. Petitioner was also aware of his constitutional rights which is exemplified by Petitioner's detailed discussion about how he asserted his right to remain silent and to have an attorney present during questioning.

In tape F Petitioner describes in vivid detail his plan to escape from jail in Colora-

---

4. The Court notes that Petitioner apparently rehearsed his closing argument before Judge Jopling on at least one prior occasion. Respondent's exhibit 1–I, a tape recording prepared by the Petitioner following the penalty phase of the Leach murder trial, contains Petitioner's rendition of the closing argument he later presented to Judge Jopling in open court. The Court concludes, therefore, that Petitioner's argument to Judge Jopling was a well planned act on the part of Petitioner.

5. During tape B, Petitioner departed briefly from his discussions concerning his childhood by first recording a portion of a television program Petitioner apparently was viewing, and second by discussing possible alibi evidence which would aid his defense in the Chi Omega murder case. Petitioner recounts that he bought gas with a stolen credit card at a Gulf station on his way out of Tallahassee, Florida during the time that the murders were occurring.

do for a second time and his preparations, both physical and mental, for the escape. Petitioner's attention to details and ability to recall details can only mean that Petitioner was very much aware of his surroundings and very much in control of his faculties and could receive and process information with incredible exactitude. In other tapes, Petitioner describes his successful escape from Colorado imprisonment and the exhausting journey through the Colorado mountains and wilderness.

In tapes G, H and I, Petitioner describes his present sense impressions concerning Petitioner's trial for the murder of Kimberly Diane Leach. It is apparent from these tapes that Petitioner was clearly aware of what was transpiring in and out of the courtroom. For example, in tape I Petitioner expresses concern over a jury instruction which Petitioner believed should not have been read. Petitioner is visibly agitated and concerned that he will not be able to bring this matter to the attention of his attorneys prior to the jury returning with a verdict.

In tapes G and H Petitioner has apparently just received the jury verdict of guilty for the murder of Kimberly Leach. Petitioner is understandably depressed, but blames the unfortunate turn of events on the extensive publicity which was given to his case. Though this Court does not agree with Petitioner's contention that media publicity tainted his trial, the Court does note that media coverage was extensive and that Petitioner was acutely aware of that publicity at all times. In addition, Petitioner was contemplating strategy concerning the upcoming penalty phase of the trial. Petitioner was clearly aware that the death penalty was a very real possibility and Petitioner was concerned about what he could do and say to avoid a jury recommendation of death.

The Petitioner's observations and opinions expressed on tapes G, H and I leads this Court to believe that Petitioner was at all times cognizant of the proceedings. Petitioner's ability to receive and process information, and later relate that information by tape recording, was exceptional. There

is nothing in any of the tapes prepared by Petitioner at or near the time of the Leach murder trial which would lead this Court to question Petitioner's ability to comprehend and appreciate the nature of the proceedings against him. Indeed, Petitioner's tape recorded messages to Stephen Michaud mirror a person with an exceptional memory, superior verbal skills and a high intelligence level.

The question of competency calls for a basically subjective judgment. Unlike the determination of whether the death penalty is appropriate in a particular case, the competency determination depends substantially on expert analysis in a discipline fraught with subtleties and nuances. Consequently, it is this Court's job to weigh the evidence and determine questions of credibility. Faced with a record that supports conflicting inferences, this Court must consider the opinions of the psychiatric experts in light of all surrounding circumstances and determine which opinion is more realistic and credible given the evidence presented. Further, in considering competency, the Court may rely on, in addition to expert testimony, lay witnesses testimony concerning the Petitioner's rational behavior, and cross-examination of Petitioner's expert. *See United States v. Mota*, 598 F.2d 995, 998–1000 (5th Cir.1979), *cert. denied*, 444 U.S. 1084, 100 S.Ct. 1042, 62 L.Ed.2d 770 (1980).

Upon reviewing the voluminous records in this case, observing the demeanor of each of the witnesses, and considering the expert testimony concerning Petitioner's competency to stand trial for the murder of Kimberly Diane Leach, the Court accepts the testimony and opinions of Dr. Charles Mutter and Dr. Unesh Mhapre as being logical and consistent with the testimony of other witnesses, as well as the record evidence, tape recordings and video cassette recordings submitted for consideration in this cause. Accordingly, the Court finds that Petitioner, Theodore Robert Bundy, possessed sufficient present ability to consult with his attorneys with a reasonable degree of rational understanding, and that Petitioner had a rational as well as factual understanding of the proceeding against him at all relevant

times during the trial and pretrial proceedings in the Kimberly Diane Leach murder case.

Petitioner appreciated the charges that were pending against him and he understood and appreciated the range and nature of the possible jeopardy he faced if convicted for the murder of Kimberly Diane Leach. Petitioner clearly understood the adversary nature of the proceedings in the Leach murder case and was well informed as to the legal process. Petitioner had the ability and capacity to disclose to his attorneys pertinent facts surrounding the murder of Kimberly Leach. Petitioner also related well with his attorneys in the Leach murder case, and Petitioner, on many occasions, assisted his attorneys during the course of the Leach murder trial and pretrial proceedings. Petitioner was clearly motivated to help his case, and he was actively involved in the planning of defense strategy. Further, it is clear from the numerous depositions taken by Petitioner that Petitioner was not only motivated to present a winning defense, but he was also an effective questioner. Finally, the Court notes that Petitioner had no problem adjusting to the stress of incarceration prior to trial. Consequently, the Court finds as a matter of law that Petitioner, Theodore Robert Bundy, was at all times competent to stand trial for the murder of Kimberly Diane Leach.