Theodore Robert BUNDY, Petitioner–Appellant,

v.

Richard L. DUGGER, Secretary, Department of Corrections, State of Florida, Respondent–Appellee.

No. 86–3773.

United States Court of Appeals, Eleventh Circuit.

July 7, 1988.

Polly Nelson, Wilmer, Cutler and Pickering, James E. Coleman, Jr., John Byron Sandage, Andrew James Munro, Washington, D.C., for petitioner-appellant.

Mark Menser, Asst. Atty. Gen. of Fla., Dept. of Legal Affairs, Tallahassee, Fla., Raymond L. Marky, John M. Koenig, Jr., Asst. Attys. Gen., Tallahassee, Fla., for respondent-appellee.

Before VANCE, KRAVITCH and JOHNSON, Circuit Judges.

JOHNSON, Circuit Judge:

Theodore Robert Bundy was convicted and sentenced to death in Florida for the murder of Kimberly Leach.[1] On direct appeal, the Florida Supreme Court affirmed the conviction and sentence. *Bundy v. State*, 471 So.2d 9 (Fla.1985), *cert. denied*, 479 U.S. 894, 107 S.Ct. 295, 93 L.Ed.2d 269 (1986). The Governor of Florida signed a death warrant scheduling Bundy's execution for November 18, 1986. On November 17, Bundy was unsuccessful in state post conviction and habeas corpus proceedings. *Bundy v. State*, 497 So.2d 1209 (Fla.1986).

Bundy immediately filed an application for a stay of execution, a petition for a writ of habeas corpus, and an application for a certificate of probable cause with the United States District Court for the Middle District of Florida. On November 17, the district court, having reviewed the trial record in advance, dismissed the petition without a hearing and denied the applications for a stay of execution and for a certificate of probable cause. *Bundy v. Wainwright*, No. 86–968–CIV–ORL–18 (M.D.Fla. Nov. 17, 1986). This Court subsequently granted a certificate of probable cause and a stay of execution pending appeal. *Bundy v. Wainwright*, 805 F.2d 948 (11th Cir.1986) (*Bundy II*), *application to vacate stay denied*, ___ U.S. ___, 107 S.Ct. 483, 93 L.Ed.2d 426 (1986).

After briefing and oral argument, this Court remanded the case to the district court for the limited purpose of conducting an evidentiary hearing into Bundy's competence to stand trial. *Bundy v. Dugger*, 816 F.2d 564 (11th Cir.), *cert. denied*, ___ U.S. ___, 108 S.Ct. 198, 98 L.Ed.2d 149 (1987). On remand, the district court conducted an evidentiary hearing and concluded that Bundy was competent to stand trial. *Bundy v. Dugger*, 675 F.Supp. 622 (M.D.Fla. 1987). This Court ordered supplemental briefing on the competence to stand trial issue and heard oral argument.

## I. *Abuse of the Writ*

We expressly state at the outset a conclusion implicit in the earlier decision of a limited remand: Bundy's first federal habeas corpus petition should not be dismissed for abuse of the writ. Typically, "abuse of the writ" principles apply to second or successive petitions that present claims that were raised, or that could have been raised, in previous petitions. *See* 28 U.S.C. § 2554 Rule 9(b); *see also Antone v. Dugger*, 465 U.S. 200, 104 S.Ct. 962, 79 L.Ed.2d 147 (1984). Although this is Bundy's first petition, the district court considered the petition abusive:

At approximately 2:30 p.m. on November 17, 1986, sixteen and one half hours prior to the time Mr. Bundy is scheduled to be executed, the petitioner filed a 183 page petition for writ of habeas corpus asking this [C]ourt to stay the execution and grant relief to the petitioner. This Court considers the petition filed under these conditions to be abusive. *Davis v.*

---

[1]. During the time Bundy was awaiting trial in this case, he was convicted and sentenced to death for two murders committed in Tallahassee ("Leon County case"). *Bundy v. State*, 455 So.2d 330 (Fla.1984). This Court has remanded Bundy's federal habeas corpus challenge in that case to the district court for proper consideration under 28 U.S.C. § 2254. *Bundy v. Wainwright*, 808 F.2d 1410 (11th Cir.1987) (*Bundy I*).

*Wainwright,* [— U.S. —] 107 S.Ct. 17 [92 L.Ed.2d 783] (1986). Slip op. at 1.

■ We disagree.[2] Even assuming *arguendo* that a first petition could be dismissed as an abuse of the writ because it was filed on the eve of execution,[3] this case does not present an abusive situation. The United States Supreme Court denied certiorari review of Bundy's direct appeal on October 14, 1986. On October 21, the Governor of Florida signed a death warrant scheduling Bundy's execution for November 18. Bundy began state postconviction and habeas proceedings on November 7 and those proceedings concluded on November 17. Bundy then filed his federal petition. Under these facts, the filing on the eve of execution does not constitute abuse of the writ.[4]

## II. *Competence to Stand Trial*

■ As set forth above, the district court, after a limited remand from this Court, conducted an evidentiary hearing and concluded that Bundy was competent to stand trial. *Bundy v. Dugger,* 675 F.Supp. 622 (M.D.Fla.1987). We begin our analysis by setting forth the applicable legal standards central to our review of the district court's conclusion. First, "[t]he legal test for mental competency is whether, at the time of trial and sentencing, the petitioner had 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding' and whether he had 'a rational as well as factual understanding of the proceedings against him.'" *Adams v. Wainwright,* 764 F.2d 1356, 1359–60 (11th Cir.1985) (quoting *Dusky v. United States,* 362 U.S. 402, 402, 80 S.Ct. 788, 789, 4 L.Ed.2d 824 (1960)), *cert. denied,* 474 U.S. 1073, 106 S.Ct. 834, 88 L.Ed.2d 805 (1986). Second, Bundy had the burden of proof on remand: "At the ensuing district court hearing, petitioner [the defendant] bears the burden of proving the fact of incompetency by a preponderance of the evidence." *Price v. Wainwright,* 759 F.2d 1549, 1553 (11th Cir. 1985) (citing *Zapata v. Estelle,* 585 F.2d 750, 752 (5th Cir.1978) (en banc)). Third, the standard of appellate review provides:

Before the court can meaningfully apply [the *Dusky*] legal standard ... it must often ascertain the nature of petitioner's allegedly incapacitating illness. It is at this initial juncture that expert testimony is particularly valuable, for the existence of even a severe psychiatric defect is not always apparent to laymen. Because of this difficulty in detecting medical diseases, the trial court may find it necessary to make an initial factfinding on whether the accused suffers from a mental defect at all. Although sometimes dispositive of the ultimate competency question, this medical inquiry is properly classified as pure factfinding

---

2. Despite its comment that it considered Bundy's petition abusive, the district court added that it would "give the petitioner a conscientious review of the issues." Slip op. at 1. Consequently, it cannot be said that the district court dismissed the petition for abuse of the writ.

3. The district court misplaced its reliance on Justice Powell's concurring opinion in *Davis. See* 107 S.Ct. at 18 (Powell, J., concurring) ("In the future, and here I can write only for myself, I will expect counsel whose papers are filed with me as Circuit Justice on the eve of the execution date, to make an appropriate explanation."). Despite Justice Powell's admonition, the full Supreme Court granted stays of execution, although the applications for stay were not filed until the day before the scheduled execution. Consequently, *Davis* does not support the district court's observation. Likewise, none of the cases cited by the state support the proposition that a first petition can be dismissed as

abusive because it was filed on the eve of execution. Furthermore, this Court subsequently held in *Davis v. Dugger,* 829 F.2d 1513, 1514 (11th Cir.1987), that "the scheduling of an execution does not, in and of itself, create a basis for dismissing a petition under the abuse of the writ doctrine." *See also Antone,* 465 U.S. at 206 n. 4, 104 S.Ct. at 965 n. 4 (time constraints do not excuse failure to raise claim in a prior petition); *Adams v. Wainwright,* 804 F.2d 1526, 1533–34 (11th Cir.1986) (time constraints do not excuse failure to develop facts associated with claim raised in a prior petition).

4. We likewise find no basis to dismiss the petition as a "delayed" petition. *See* 28 U.S.C. § 2254 Rule 9(a). Similarly, the state's argument that Bundy's petition presents frivolous claims and, therefore, that a finding of abuse is warranted is without merit. Rule 9 does not examine the strength of the claims. *Cf.* 28 U.S. C. § 2254 Rule 4.

and reviewable only under the clearly erroneous standard.

Once it is established that an individual suffers from a clinically recognized disorder, the court must decide whether such condition rendered the accused incompetent under the *Dusky* formulation.... [T]his second stage determination of legal incompetency is subject to a review more stringent than the clearly erroneous rule. To insure protection of valuable constitutional rights, this court is bound to take a hard look at the ultimate competency "finding."

5. From our predecessor circuit we have inherited two somewhat inconsistent lines of authority with respect to the standard of review we should apply to the district court's finding that Bundy was competent to stand trial. Under one line of cases a district court's finding of competency to stand trial is a finding of fact that can be set aside only if clearly erroneous or arbitrary. *See United States v. Hayes,* 589 F.2d 811, 822 (5th Cir.), *cert. denied,* 444 U.S. 847, 100 S.Ct. 93, 62 L.Ed.2d 60 (1979); *United States v. Fratus,* 530 F.2d 644, 647 (5th Cir.), *cert. denied,* 429 U.S. 846, 97 S.Ct. 130, 50 L.Ed.2d 118 (1976); *United States v. Stone,* 472 F.2d 909, 913 (5th Cir.1973), *cert. denied,* 449 U.S. 1020, 101 S.Ct. 586, 66 L.Ed.2d 482 (1980); *United States v. Gray,* 421 F.2d 316, 317 (5th Cir.1970); *see also United States v. Birdsell,* 775 F.2d 645, 648 (5th Cir.1985), *cert. denied,* 476 U.S. 1119, 106 S.Ct. 1979, 90 L.Ed.2d 662 (1986). This is consistent with the approach taken by other circuits. *See, e.g., McFadden v. United States,* 814 F.2d 144, 146 (3d Cir.1987); *United States v. Lovelace,* 683 F.2d 248, 251 (7th Cir.1982); *Chavez v. United States,* 656 F.2d 512, 517 (9th Cir.1981); *United States v. Caldwell,* 543 F.2d 1333, 1349 (D.C.Cir.1974), *cert. denied,* 423 U.S. 1087, 96 S.Ct. 877, 47 L.Ed.2d 97 (1976) (all using the clearly erroneous standard). In another line of cases, however, the Fifth Circuit has been less deferential, reviewing historical facts under a clearly erroneous standard but taking a more stringent "hard look" at the district court's ultimate finding of competency. *See Lokos v. Capps,* 625 F.2d 1258, 1267 (5th Cir.1980); *Bruce v. Estelle,* 536 F.2d 1051, 1059–60 (5th Cir.1976), *cert. denied,* 429 U.S. 1053, 97 S.Ct. 767, 50 L.Ed.2d 770 (1977); *United States v. Makris,* 535 F.2d 899, 907 (5th Cir.1976), *cert. denied,* 430 U.S. 954, 97 S.Ct. 1598, 51 L.Ed.2d 803 (1977); *see also Wheat v. Thigpen,* 793 F.2d 621, 631 (5th Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 1566, 94 L.Ed.2d 759 (1987). Because we would uphold the district court's finding that Bundy was competent to stand trial under either standard, we need not resolve this inconsistency. Instead, we will assume that the stricter "hard look" standard applies and ana-

*Bruce v. Estelle,* 536 F.2d 1051, 1059–60 (5th Cir.1976), *cert. denied,* 429 U.S. 1053, 97 S.Ct. 767, 50 L.Ed.2d 770 (1977).[5]

*Bruce* suggests that a district court's determination of competency should proceed in two parts: (1) Does the defendant suffer from a clinically recognized disorder? and (2) if so, did that disorder render the defendant incompetent under the *Dusky* standard? In the present case, Bundy argued that he suffered from bipolar mood disorder.[6] Although the district court did not segregate its analysis as suggested by *Bruce,* our reading of the district court's opinion, particularly the conclusion,[7]

lyze the district court's finding under that standard.

6. A bipolar mood disorder is better known as manic depressive mental illness. Bipolar mood disorders are characterized by wide changes in mood or mood swings. During the manic phase, the person can be loud, angry, violent, or grandiose. At the other extreme, the person would experience periods of extreme depression.

7. The district court concluded:

Upon reviewing the voluminous records in this case, observing the demeanor of each of the witnesses, and considering the expert testimony concerning Petitioner's competency to stand trial for the murder of Kimberly Diane Leach, the Court accepts the testimony and opinions of · Dr. Charles Mutter and Dr. U[m]esh Mha[t]re as being logical and consistent with the testimony of other witnesses, as well as the record evidence, tape recordings and video cassette recordings submitted for consideration in this cause. Accordingly, the Court finds that Petitioner, Theodore Robert Bundy, possessed sufficient present ability to consult with his attorneys with a reasonable degree of rational understanding, and that Petitioner had a rational as well as factual understanding of the proceeding against him at all relevant times during the trial and pretrial proceedings in the Kimberly Diane Leach murder case.

Petitioner appreciated the charges that were pending against him and he understood and appreciated the range and nature of the possible jeopardy he faced if convicted for the murder of Kimberly Diane Leach. Petitioner clearly understood the adversary nature of the proceedings in the Leach murder case and was well informed as to the legal process. Petitioner had the ability and capacity to disclose to his attorneys pertinent facts surrounding the murder of Kimberly Leach. Petitioner also related well with his attorneys in the Leach murder case, and Petitioner, on

indicates that the district court determined that, even if Bundy otherwise suffered from bipolar mood disorder, the disorder was not manifesting itself so as to affect his competence to stand trial. Consequently, pursuant to *Bruce,* we take a "hard look" at the ultimate competency "finding."

Bundy argues that, although he had a factual understanding of the proceedings against him, he lacked a rational understanding of those proceedings and a rational understanding necessary to consult with his lawyer. We have undertaken a detailed review of the record and given a "hard look" to the district court's conclusion of "competency." Based upon the record evidence of the testimony (including depositions) at the evidentiary hearing and the associated exhibits, we hold that the district court's findings of historical fact were not clearly erroneous, *see Amadeo v. Zant,* — U.S. ——, 108 S.Ct. 1771, 100 L.Ed.2d 249 (1988), and thus we will not reiterate the district court's findings here. We do, however, highlight the record evidence that leads us to conclude, after a "hard look," that Bundy was competent to stand trial.[8]

Dr. Dorothy Lewis and Dr. Emanuel Tanay, both psychiatrists, testified[9] that Bundy was incompetent to stand trial. Dr. Charles Mutter and Dr. Umesh Mhatre, both psychiatrists, testified in rebuttal for the State. The district court credited the testimony of Drs. Mutter and Mhatre. We agree with the district court's observation that their testimony better accorded with the testimony of other witnesses and the associated exhibits.[10]

For example, Judge Wallace Jopling, the presiding judge at the Lake City trial, and prosecutors George Dekle and Jerry Blair testified about Bundy's actions at trial. This testimony indicates that Bundy's actions were inconsistent with the actions of a person manifesting bipolar mood disorder.[11]

In addition, the exhibits from the hearing, largely ignored by Bundy in his supplemental brief, indicate that Bundy was competent to stand trial. The videotape of Bundy's argument to Judge Jopling prior to sentencing shows that Bundy delivered a cogent, well-reasoned argument. Bundy focused on the effect of pretrial publicity on the jury and argued that the jury was overwhelmed more by the quantity, than the quality, of the state's evidence. Bundy can be seen flipping pages of a legal pad as he goes through his argument.

The tapes made by Bundy[12] while awaiting the verdict and shortly after the verdict

---

many occasions, assisted his attorneys during the course of the Leach murder trial and pretrial proceedings. Petitioner was clearly motivated to help his case, and he was actively involved in the planning of defense strategy. Further, it is clear from the numerous depositions taken by Petitioner that Petitioner was not only motivated to present a winning defense, but he was also an effective questioner. Finally, the Court notes that Petitioner had no problem adjusting to the stress of incarceration prior to trial. Consequently, the Court finds as a matter of law that Petitioner, Theodore Robert Bundy, was at all times competent to stand trial for the murder of Kimberly Diane Leach.
*Bundy,* 675 F.Supp. at 634–35.

8. Bundy also raises claims concerning ineffective assistance of counsel relating to Bundy's competence to stand trial. In light of our conclusion that Bundy was competent to stand trial, the related ineffective assistance of counsel claims lack merit.

9. Dr. Tanay's testimony was from a deposition taken on December 14, 1987.

10. Bundy emphasizes in his brief that only Dr. Lewis had recently interviewed him and that Drs. Mutter and Mhatre had not. We agree with the explanation of Drs. Mutter and Mhatre that a recent interview was unnecessary because the narrow issue of focus was Bundy's competence to stand trial at the time of the trial. Similarly, we reject the suggestion in Bundy's brief that Dr. Mhatre's opinion is entitled to less weight because Dr. Mhatre interviewed only one of Bundy's defense lawyers. Dr. Mhatre interviewed Victor Africano, Bundy's lawyer during the Lake City trial.

11. Bundy did express (out of the presence of the jury) dissatisfaction at the selection of one of the jurors. Considerable testimony before the district court, however, suggests that either the outburst was calculated to win favor from Bundy's peers on death row or it was legitimate in light of the juror's statements.

12. These tapes were to be used to prepare a book about Bundy.

strongly demonstrate that Bundy had a rational understanding of the proceedings. For example, on tape I (recorded while the jury was deliberating), Bundy describes his displeasure at one of the trial judge's instructions, evaluates some of the evidence against him, and criticizes the state's closing argument for referring to facts not in evidence. On tape G (recorded two hours after the jury returned its guilty verdict), Bundy recalls that after closing argument he bet members of the defense team that the jury would be back within three hours with a guilty verdict: "I was attempting to protect myself—insulate myself from the terribly harsh consequences of a guilty verdict...." On that tape, Bundy recalls evaluating the trial proceedings: "I can remember throughout the course of the trial, my counsel, myself, speculating on the reactions of jurors to state witnesses, the reactions of jurors to defense witnesses, speculating on the ineffectiveness of certain state witnesses, and the convincing qualities of our witnesses." On tape H (recorded on the morning after the jury returned its guilty verdict), Bundy describes how, when he woke up that morning, "I immediately began thinking about the statements I'm going to make to the jury during the penalty phase and the statements I'm going to make to the judge when he sentences me. Right now my concern lies with just what the tenor of those comments should be." Consequently, a "hard look" at the record evidence supports the conclusion that Bundy was competent to stand trial.[13]

**13.** We recognize that in the decision of remand this Court focused on "strong indicia" of possible incompetence to stand trial. *See Bundy II*, 816 F.2d at 567. This Court cautioned, however, that a final determination could be made only after a full and fair evidentiary hearing. *Id.* at 568. Our review of the record in light of the district court's observations concerning these indicia convinces us that what appeared as "strong indicia" prior to the hearing are happenings that are consistent with a determination that Bundy was competent to stand trial.

**14.** Bundy claims in his federal habeas corpus petition that "[t]he *ground* for the court's denial was a contempt citation arising from Mr. Farmer's persistent objection, in a Georgia criminal matter, to the prosecutor referring to the black

## III. *Choice of Counsel*

Bundy argues that he was denied his Sixth Amendment right to choice of counsel. This claim overlaps with Bundy's claim that his counsel provided ineffective assistance of counsel by failing to raise this claim on direct appeal. Shortly after his indictment, Bundy asked the trial court to grant the motion of Georgia attorney Millard Farmer to be admitted *pro hac vice*. The trial court denied the motion after conducting an evidentiary hearing and allowing oral argument. *See State v. Bundy*, No. 78–169–CF (Fla.Cir.Ct.Columbia County Sept. 22, 1978) (Jopling, J.) (R. 14,117; vol. 156, app. 37).[14] On direct appeal, Bundy did not claim that he was denied the counsel of his choice. Bundy then raised this claim in state postconviction proceedings. The Florida Supreme Court found this claim procedurally barred because it could have been raised on direct appeal. *See Bundy*, 497 So.2d at 1210. The Court also found Bundy's related ineffective assistance of appellate counsel claim to be without merit. *Id.* at 1211.

Bundy then raised the choice of counsel claim and the related ineffective assistance of appellate counsel claim in his federal habeas corpus petition. The district court determined that the choice of counsel claim was procedurally defaulted, *see* slip op. at 9, and the related ineffective assistance of counsel claim was not a basis for relief because the district court had denied relief on the merits of the choice of counsel claim.[15] *See* slip op. at 12.

defendant by his first name rather than by his surname, as the prosecutor referred to other persons in the proceeding." *See* para. 92 (emphasis added) (citing *Farmer v. Holton*, 146 Ga. App. 102, 245 S.E.2d 457 (1978) (overruled by *In re Crane*, 253 Ga. 667, 324 S.E.2d 443, 446 (1985)), *cert. denied*, 440 U.S. 958, 99 S.Ct. 1499, 59 L.Ed.2d 771 (1979)). We note that the trial court did not base its denial *solely* on the *Farmer v. Holton* decision. *See* R:14,121–22. For reasons set forth in the text *infra*, we do not evaluate the trial court's denial of the motion to appear *pro hac vice*.

**15.** We agree with Bundy that the district court did not address the merits of the choice of counsel claim and thus erred in its reasoning

■ We conclude that Bundy's failure to raise the choice of counsel claim on direct appeal constitutes procedural default. *See Murray v. Carrier*, 477 U.S. 478, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986). Consequently, Bundy must show both cause for noncompliance with the state rule and actual prejudice resulting from the alleged constitutional violation. *Smith v. Murray*, 477 U.S. 527, 533, 106 S.Ct. 2661, 2665, 91 L.Ed.2d 434 (1986).

■ Bundy contends that ineffective assistance of his appellate counsel satisfies the cause requirement.[16] *See Carrier*, 477 U.S. at 488, 106 S.Ct. at 2646 ("Ineffective assistance of counsel ... is cause for a procedural default."). We disagree as we do not find Bundy's counsel ineffective.[17] The Supreme Court's decision in *Smith* informs our analysis. The Supreme Court reasoned that, when viewed in light of state law at the time of direct appeal, the decision not to raise the claim "fell well within the 'wide range of professionally competent assistance' required under the Sixth Amendment to the Federal Constitution." *Smith*, 477 U.S. at 536, 106 S.Ct. at 2667 (quoting *Strickland v. Washington*, 466 U.S. 668, 690, 104 S.Ct. 2052, 2066, 80 L.Ed.2d 674 (1984)); *see id.* at 535, 106 S.Ct. at 2667 ("Nor can it seriously be maintained that the decision not to press the claim on appeal was an error of such magnitude that it rendered counsel's performance constitutionally deficient under the test of *Strickland v. Washington*, 466 U.S. 668 [104 S.Ct. 2052, 80 L.Ed.2d 674] (1984)."); *see also Jones v. Barnes*, 463 U.S. 745, 751–54, 103 S.Ct. 3308, 3312–14,

77 L.Ed.2d 987 (1983) (recognizing that appellate counsel needs latitude in selecting issues to raise on appeal).

In his direct appeal in the Leon County case, which antedated the direct appeal in the present case, Bundy raised the choice of counsel claim and the Florida Supreme Court found it without merit. *See Bundy v. State*, 455 So.2d 330, 347–48 (Fla.1984).[18] Consequently, pursuant to *Smith*, Bundy's counsel was not ineffective for not raising the choice of counsel claim on direct appeal.[19] Finally, this is not "an extraordinary case" where the writ should be granted even absent a showing of cause. *See Carrier*, 477 U.S. at 496, 106 S.Ct. at 2660; *Smith*, 477 U.S. at 537–39, 106 S.Ct. at 2668–69.

## IV. *Ineffective Assistance of Counsel*

Bundy argues that he received ineffective assistance of counsel at trial on a number of grounds. The Florida Supreme Court, *see Bundy*, 497 So.2d at 1210, and the district court, *see* slip op. at 9–12, held this claim without merit. We affirm the district court because none of the asserted grounds satisfies both the performance and prejudice prongs enunciated by *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

Bundy first complains of ineffectiveness of trial counsel in relation to the investigation concerning fiber evidence, the hearing on the motion in limine to exclude such evidence, the failure to object to the conclusions testified to by the state's expert witness, and the failure to have a defense

for rejecting the related ineffective assistance of counsel claim.

16. Because Bundy presented the ineffective assistance of counsel claim as an independent claim to the Florida courts, the exhaustion doctrine is not implicated here. *See Carrier*, 477 U.S. at 488–89, 106 S.Ct. at 2646.

17. Because we do not agree that Bundy has satisfied the "cause" requirement, we do not examine whether Bundy demonstrated actual prejudice.

18. We also note that immediately after the denial of the motion to appear *pro hac vice* in the

Leon County case, Bundy filed an action in federal court pursuant to 42 U.S.C. § 1983. Bundy alleged that the denial violated his Sixth Amendment right to counsel. This Court, affirming on the basis of the district court's opinion, concluded that *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), precluded a federal court from examining Bundy's claim. *See Bundy v. Rudd*, 581 F.2d 1126, 1129–30 (5th Cir.1978), *cert. denied*, 441 U.S. 905, 99 S.Ct. 1992, 60 L.Ed.2d 373 (1979).

19. Accordingly, Bundy could not rely on the novelty of his legal claim as "cause" for noncompliance with Florida's rules. *See Smith*, 477 U.S. at 536–37, 106 S.Ct. at 2668.

expert testify regarding the fibers. We have reviewed the record evidence and, particularly based upon the cross-examination regarding the source of the van's carpet, the users of the van, and the clothes worn in the van; the arguments on the motion in limine; the cross-examination of the state's expert, and the examination of witnesses recalled as part of the defense's presentation, we conclude that Bundy has failed to satisfy *Strickland*'s performance prong. In addition, in ruling on this claim in the state postconviction proceeding, the trial court stated that it would have permitted the evidence anyhow. Consequently, it does not appear that the prejudice prong was met.

Bundy next argues that he received ineffective assistance of counsel in connection with the plea agreement. A review of the record again demonstrates that Bundy has not satisfied the performance prong. In addition, Bundy asserts that counsel had to disclose damaging information to the state in the course of negotiations. Bundy does not allege what that information was or whether it was used at trial. Consequently, this assertion does not raise a colorable showing of prejudice sufficient to trigger an evidentiary hearing.

Bundy next claims that he received ineffective assistance of counsel because no evidence was presented at the penalty phase of trial that he was suffering from a mental disorder. As a related claim, Bundy argues that he was denied effective assistance of counsel by counsel's failure to investigate an insanity defense. The record indicates an insanity defense was investigated and that Bundy rejected any suggestion that such a defense be presented. In addition, Bundy would not admit complicity of the crimes upon which he was convicted. Based upon Bundy's actions and the actual presentation at the penalty phase, we cannot say that Bundy has satisfied the performance prong. The record also indicates that, even if such evidence were presented, the state could produce countering evidence and thus, in light of the aggravating circumstances, no prejudice resulted.

Finally, Bundy argues that he received ineffective assistance of counsel because no challenge was made to the use of prior convictions as aggravating circumstances. Bundy does not suggest any basis for a challenge to the Utah convictions. We cannot say that Bundy has satisfied the performance prong as to his Leon County convictions. That conclusion is buttressed by the Florida Supreme Court's subsequent affirmance of those convictions. In addition, we do not believe Bundy has satisfied the prejudice prong. Three aggravating circumstances remain independent of the Leon County convictions.

## V. *Faretta Inquiry*

Bundy claims that the trial court failed to conduct a proper inquiry into whether he should have been allowed to represent himself during critical stages of the prosecution. *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). This claim overlaps with Bundy's claim that his counsel provided ineffective assistance of counsel by failing to raise this claim on direct appeal.

On September 21, 1978, after the trial court orally denied the motion for Farmer to appear *pro hac vice*, the trial court asked Bundy if he had other counsel to represent him. In relevant part, Bundy replied:

> [S]eeing that the Court in its wisdom has denied me representation by Mr. Farmer, I will proceed pro se.
>
> In the first instance, I guess I should ask for leave to proceed in proper person and submit in support of my motion the case of Anthony Pasquale Faretta versus the State of California 42[2] U.S. 806 [95 S.Ct. 2525, 45 L.Ed.2d 562], case decided in 1975.

Supp. R3:144–45 (footnote omitted). The trial court permitted Bundy to proceed pro se. Subsequently, at the request of the state's attorney, the trial court asked Bundy what education he had. Bundy replied in relevant part:

> I have a Bachelor of Science in Psychology from the University of Washing-

ton and two years of law school. I think, however, if the Court will read *Faretta*, the United States Supreme Court has said that the legal background or legal training of a defendant who wishes to represent himself is not an issue. If the man or woman wishes to represent himself or herself, understandingly, knowingly and voluntarily expresses the desire to do so, he or she may exercise that Sixth Amendment right applied to the States through the Fourteenth Amendment and so I don't really think that an inquiry into my background, beyond my stating that I knowingly and voluntarily and understandingly take this step, is necessary.

*Id.* at 147–48. On June 21, 1979, Bundy withdrew his waiver of counsel and accepted Victor Africano as his attorney in the Lake City case. R157:14,383. Africano served as Bundy's attorney from that pretrial point to the conclusion of the direct appeal.

On direct appeal, Bundy did not claim he was denied a proper *Faretta* hearing. Bundy then raised this claim in state postconviction proceedings. The Florida Supreme Court held:

> We find that the appellant's fourth claim [i.e., the *Faretta* inquiry] could have been raised on direct appeal and is therefore barred from consideration. Even if we were to examine the claim, however, we would find it lacking in substance. The trial court conducted an inquiry into appellant's ability to act as his own counsel prior to allowing him to represent himself, and during this inquiry appellant himself alerted the trial court to the teachings of *Faretta*. We may not now reverse the trial court's finding of appellant's ability to pursue his own representation.

*Bundy,* 497 So.2d at 1210. The Court also found Bundy's related ineffective assistance of appellate counsel claim to be without merit. *Id.* at 1211. Although the state

asserted before the district court that the *Faretta* inquiry claim was subject to the procedural default doctrine, the district court did not mention that doctrine, but rather concluded that Bundy was not entitled to relief on the merits. *See* slip op. at 12–13.

 On appeal, the state renews its argument that the claim is subject to the procedural default doctrine. When it is clear that a state court is addressing a *particular* claim (i.e., the Florida Supreme Court's reference to "the appellant's fourth claim") and the state court expressly states that the claim is barred from consideration, we conclude that the state court has not excused the procedural default when it proceeds alternatively and hypothetically to address the merits of the claim. Consequently, we conclude that Bundy's failure to raise the *Faretta* inquiry claim on direct appeal constitutes procedural default. *See Murray v. Carrier, supra.* Bundy thus must show both cause for noncompliance with the state rule and actual prejudice resulting from the alleged constitutional violation. *Smith,* 477 U.S. at 533, 106 S.Ct. at 2665.

Bundy again contends that ineffective assistance of his appellate counsel satisfies the cause requirement.[20] *See Carrier,* 477 U.S. at 488, 106 S.Ct. at 2646 ("Ineffective assistance of counsel ... is cause for a procedural default."). Again, we rely on the Supreme Court's analysis in *Smith* to conclude that Bundy has not met the cause requirement. In light of Bundy's citation of the *Faretta* decision to the trial court, his comments to the trial court, and Africano's serving as Bundy's attorney from well before trial to the conclusion of direct appeal, "the decision not to press the claim on appeal was [not] an error of such magnitude that it rendered counsel's performance constitutionally deficient."[21] *Smith,* 477 U.S. at 535, 106 S.Ct. at 2667; *see also Jones v. Barnes,* 463 U.S. 745, 751–54, 103

---

20. *See supra* note 16.

21. Bundy cannot argue that this claim is so novel as to constitute cause. *See Smith,* 477 U.S. at 536–37, 106 S.Ct. at 2667–68. Nor is this

"an extraordinary case" where the writ should be granted even absent a showing of cause. *See Carrier,* 477 U.S. at 496, 106 S.Ct. at 2650; *Smith,* 477 U.S. at 537–39, 106 S.Ct. at 2667–69.

S.Ct. 3308, 3312–14, 77 L.Ed.2d 987 (1983) (recognizing that appellate counsel needs latitude in selecting issues to raise on appeal).

■ Alternatively, if the procedural default doctrine did not preclude us from examining the merits of the *Faretta* inquiry claim, we would conclude that Bundy was not entitled to relief on this ground. This Circuit generally requires that a trial judge conduct a waiver hearing to make sure that the accused understands the risks of proceeding pro se. *See Jackson v. James,* 839 F.2d 1513, 1516 (11th Cir.1988) and cases cited therein. In the present case, the passage quoted above indicates that the trial court did not inform Bundy of the disadvantages of proceeding pro se. Bundy, however, cited *Faretta* to the trial court and asserted that he was "knowingly and voluntarily and understandingly tak[ing] this step." We do not decide whether these facts constitute a "rare" case in which an exception to the hearing requirement will be made. *See Fitzpatrick v. Wainwright,* 800 F.2d 1057, 1064–68 (11th Cir.1986). Rather, we conclude that any error by the trial court was harmless. As set forth above, well before trial in the Lake City case, Bundy accepted Victor Africano as his attorney. Africano served as Bundy's attorney from that point to the conclusion of direct appeal. Accordingly, the *Faretta* inquiry claim and the related ineffective assistance of appellate counsel claim are without merit.

### VI. *Race of the Victim*

■ Bundy argues that the Florida death penalty is unconstitutionally applied because it is disproportionately imposed in cases, such as the present case, where the victim is white. On collateral review, the Florida Supreme Court held that this claim was without merit. *See Bundy,* 497 So.2d at 1210–11. Consequently, the procedural default doctrine does not apply.

The district court also held that this claim was without merit. *See* slip op. at

13. On appeal, Bundy argues that the district court erred in denying him an evidentiary hearing on this claim. We disagree. Bundy relies solely on studies allegedly showing systematic discrimination on the basis of the victim's race. This Court repeatedly has rejected these studies as grounds for an evidentiary hearing or relief. *See Funchess v. Wainwright,* 788 F.2d 1443, 1445–46 (11th Cir.), *cert. denied,* 475 U.S. 1133, 106 S.Ct. 1668, 90 L.Ed.2d 208 (1986); *Thomas v. Wainwright,* 767 F.2d 738, 747–48 (11th Cir.1985), *cert. denied,* 475 U.S. 1031, 106 S.Ct. 1241, 89 L.Ed.2d 349 (1986), and cases cited therein. In addition, Bundy points to no evidence that the decision makers in his case acted with discriminatory purpose. *See McCleskey v. Kemp,* —— U.S. ——, 107 S.Ct. 1756, 1765–1770, 95 L.Ed.2d 262 (1987).

### VII. *Hypnotically Refreshed Testimony*

■ Bundy argues that the use of Clarence L. "Andy" Anderson's hypnotically enhanced testimony violated his Sixth Amendment right to confrontation and his Fourteenth Amendment due process right to a fair trial.[22] Anderson was the state's only eyewitness to the abduction of Kimberly Leach on February 9, 1978. On July 18, 1978, Anderson first went to the police because the profile of a person he had seen on a television newscast bore a striking resemblance to the man he had earlier observed with a girl near the Lake City Junior High School. Anderson was hypnotized twice in order to enhance his recollection. After conducting a hearing and taking testimony, the trial court denied Bundy's pretrial motion to suppress Anderson's testimony. The denial was without prejudice to Bundy's right to object at trial to specific portions of that testimony. R145:13,387; app. 22. At trial, Anderson made an in-court identification of Bundy as closely resembling the man he saw and, from a photograph introduced into evidence, identified Kimberly Leach as the girl.

This claim is without merit.

---

22. Bundy also suggests that the use of this testimony deprived him of his right to a jury trial.

■ On direct appeal, the Florida Supreme Court held "that hypnotically refreshed testimony is *per se* inadmissible in a criminal trial in this state, but hypnosis does not render a witness incompetent to testify to those facts demonstrably recalled prior to hypnosis." *Bundy,* 471 So.2d at 18. Relying on harmless-constitutional-error cases of the United States Supreme Court, the Florida Supreme Court went on to conclude that the admission of Anderson's hypnotically refreshed testimony was harmless error.[23] *Id.* at 19. The district court held this claim without merit. *See* slip op. at 13–14.

We first address Bundy's claim that admission of Anderson's testimony violated the Confrontation Clause of the Sixth Amendment. In *Rock v. Arkansas,* —— U.S. ——, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987), the Supreme Court held that a state's *per se* rule excluding hypnotically refreshed testimony impermissibly infringed on a criminal defendant's right to testify. Although the Supreme Court expressly did not address the issue presented here, *see id.* at 2712 n. 15, its reasoning informs our analysis. The Court stated that "it has not been shown that hypnotically enhanced testimony is always so untrustworthy and so immune to the traditional means of evaluating credibility" such that a *per se* ban is warranted. *Id.* at 2714. The Court recognized that cross-examination remained as an effective tool for revealing inconsistencies, *id.,* even though hypnosis may lead to the introduction of inaccurate memories,[24] "making effective cross-examination more difficult." *Id.* at 2713.

*Rock* thus teaches that, although hypnosis may make effective cross-examination more difficult, it does not always make it impossible, thereby preserving the opportunity for effective cross-examination safeguarded by the Sixth Amendment. *See Delaware v. Fensterer,* 474 U.S. 15, 20, 106 S.Ct. 292, 295, 88 L.Ed.2d 15 (1985) ("[T]he Confrontation Clause guarantees the *opportunity* for effective cross-examination...." (emphasis in original)); *accord Delaware v. Van Arsdall,* 475 U.S. 673, 678, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674 (1986). Consequently, we decline to hold that the Confrontation Clause requires a *per se* ban on the admission of hypnotically refreshed testimony.

■ We thus examine whether, on the facts of the present case, a Confrontation Clause violation occurred. "The sixth amendment confrontation clause is satisfied where sufficient information is elicited from the witness from which the jury can adequately gauge the witness['] credibility." *United States v. Burke,* 738 F.2d 1225, 1227 (11th Cir.1984). Such information was elicited here. In particular, Anderson admitted that the hypnotic sessions he underwent, to some degree, had an effect on the testimony he was giving. Moreover, defense counsel explored why Anderson took so long to come forward; Anderson's activities on the morning of February 9th; the relationship between the prosecution's search of Anderson's work schedule records and Anderson's understanding that February 9th was the date of Kimberly Leach's disappearance; Anderson's identifying Bundy on television but never participating in a photo line-up or a live line-up; Anderson's travelling the route from the fire station past Lake City Junior High School many times before; and the discrepancies between Anderson's trial testimony and his statements prior to hypnosis. The record does not demonstrate that the trial court impermissibly

---

23. Despite the reliance on harmless-constitutional-error cases, it is difficult to ascertain whether the Court relied on federal constitutional law or state evidence law in holding that hypnotically refreshed testimony is *per se* inadmissible in a criminal case. As discussed in the text *infra,* we conclude that such testimony is not *per se* inadmissible as a matter of federal constitutional law.

24. The Court cited three general characteristics of hypnosis as bases for inaccurate memories: "the subject becomes 'suggestible' and may try to please the hypnotist with answers the subject thinks will be met with approval; the subject is likely to 'confabulate,' that is, to fill in details from the imagination in order to make an answer more coherent and complete; and the subject experiences 'memory hardening,' which gives him great confidence in both true and false memories...." 107 S.Ct. at 2713.

limited the cross-examination of Anderson. In addition, Bundy examined the two hypnotists concerning their qualifications. Finally, the tape recordings of the two sessions were played to the jury, each juror received a transcript of those sessions, and Bundy presented an expert witness who addressed what he characterized as the flaws in those sessions. In light of these facts, Bundy certainly had the opportunity for effective cross-examination and no Confrontation Clause violation occurred.

■ We next examine Bundy's claim that admission of Anderson's testimony deprived Bundy of his Fourteenth Amendment due process right to a fair trial. We note at the outset that *Rock* rejects the suggestion that hypnotically refreshed testimony is so unreliable that a *per se* ban on such testimony is warranted. Accordingly, we must determine whether, on the facts in the present case, the hypnotically refreshed testimony was so unreliable as to violate due process. We conclude that the use of Anderson's testimony accorded with the dictates of due process.

In the present case, as set forth above, Anderson first went to the police on July 28, 1978, because the profile of a person he had seen on a television newscast bore a striking resemblance to a man he had earlier observed with a girl near the Lake City Junior High School. Before going to the police, Anderson had noticed a resemblance between his niece and Kimberly Leach and thought, before seeing Bundy's picture on television, that Kimberly Leach was the girl he had seen: "I probably knew it for some time. Exactly when I realized that it was the Leach girl, I have no earthly idea. I just would not admit it to myself." R21:4151.[25] Prior to coming to the police, Anderson had thought what he saw was what he testified to at trial. Indeed, during the search for Kimberly Leach,

Anderson expressed his thoughts to a fishing companion: "And I said, I don't recall specifically what I said, but I stated that I may have seen the guy that picked the Leach girl up or I may have seen someone that could have picked up the girl." *Id.* at 4152.

Anderson gave a statement at the police station. He described the man he had seen as of medium build, 5-foot-7 to 5-foot-10, and having medium or darker brown wavy hair. The man wore a light shirt or jacket. Anderson described the girl as 12 or 13 years old with shoulder-length brown hair parted in the middle. She wore dungarees or slacks and a dark pullover, and carried a sweater, jacket, or large pocketbook. He said the man led the girl, by her elbow, around the front of the van and helped her in. The girl had an unhappy look as if she had been in trouble at school. The van was white and its rear windows were covered so that Anderson could not see the man after he entered the van. He described his observation as taking place in April.

After Anderson gave his statement, the prosecutor asked Anderson if he would undergo hypnosis. Anderson agreed. Thirty to forty-five minutes later, Imogene Keene, a hypnotist, arrived. Prior to hypnosis, Anderson repeated his statement. Keene then began the procedure to hypnotize Anderson. The session was tape recorded. (The tape recording was played to the jury and each juror received a transcript of the session.) The prosecutor and police investigator were also present. Anderson testified at trial that he did not believe he was hypnotized. He recalled that his neck bothered him and affected his concentration. He remembered that people kept walking in and out of the area. The descriptions offered by Anderson suggest that he was not hypnotized. For the most part, Anderson recited the facts he had given in

---

25. Anderson explained that he delayed going to the police "[b]ecause I wasn't sure of what day I saw the girl. I wasn't sure at all. I didn't want to become involved in it. I saw one picture of Mr. Bundy. I looked at the picture. It did not closely resemble the man that I saw with the girl." R21:4146. He added that "the only reason that I can give for not coming forward sooner is, as I stated before, not wanting to be involved, having a lot of other things on my mind at the time, not knowing the exact date that I saw the girl, halfway afraid of creating turmoil, needlessly[ ] seeing [sic] law enforcement on a wild goose chase." *Id.* at 4148; *see id.* at 4074.

his statement to the police. Although he initially stated that he could not see the girl's face, in response to a question, he stated that the girl was crying. In addition, Anderson described the color of the van's license plate, although the true color was different.

At the conclusion of this first session, the prosecutor asked if Anderson would undergo hypnosis again. Anderson agreed and a second session took place three days later on July 31. After the first session, the prosecutor or police investigator suggested that Anderson go home and think about the date of his observation. Prior to the second session, Anderson recalled the date of his observation as February 9th:

[A.] ... I talked it over with my wife. I was very concerned about it, very upset about it. I didn't even know what day the girl was missing. I believe my wife said it was around the time of our little girl's birthday and then it began to dawn on me as I went over it in my mind that I saw the little girl and the man coming home from the fire department the day after my little girl's birthday.

Q. What was you little daughter's birthday?

A. February the 8th.

Q. Had you planned any events in connection with her birthday or what caused you to focus attention on her birthday?

A. My wife had planned a party where [sic] some of her friends and a movie, and I was looking forward to, you know, going to the party and taking the kids to the movies, you know, helping chaperone the kids. And I didn't make it because I was working overtime at the fire station. I got called in quite often that day to work overtime. It seemed like every time I went home, I walked in the door, the phone would be ringing and them asking me to come back down to the fire station and, late that afternoon, I got a call to go back down to the fire station, they had a trip going to Gainesville, and we needed the money, so I went and I called my wife and told her that I'm sorry, go ahead and take the kids to the party and the movie, I wasn't going to be able to make it.

Q. Okay. What, if anything, happened on February the 9th, after you got home, that allowed you to tie that incident in with your little daughter's birthday party?

A. I remember going in. I remember feeling guilty about not being with the kids at the party. Well, the first thing I did was eat a piece of my daughter's birthday cake. I asked my wife to iron me a shirt, a uniform shirt. I think probably eating the cake and just I remember feeling guilty about not making the party makes me remember it as clear as anything else.

Q. Okay. And are you certain in your own mind, as you have testified this morning, on February the 9th is the date that you made those observations that you have described to the Court?

A. Yes, sir.

Q. Now, do I understand your testimony to be that, in between July the 28th and July the 31st, you made this determination?

A. Yes, sir.

R21:4087–89.

On July 31, the second session took place. Anderson, Keene, the prosecutor, the police investigator, Johnny "Jack" Burnette, and a stenographer were present. The session was tape recorded. (The tape recording was played to the jury and each juror received a transcript of the session.) In this second session, Burnette, another hypnotist, placed Anderson under hypnosis. Anderson believed he was hypnotized during this session. During this session, Anderson stated, *inter alia*, that his observation was on February 9; that the man was fairly young (29, 30, or 31), was good looking, and was wearing a white jacket or white pullover with a shirt underneath; that the girl was wearing a blue football jersey with "3" and either "6" or "8" on it; and that the van had clear rear windows through which Anderson could see the man scold the girl. After the session, Anderson "felt better," but "[t]here are still some things bothering me. I couldn't definitely

identify the man. I couldn't remember exactly what the man was wearing. There were still some questions that I had that I would like to have been able to answer." R21:4120.

At trial, Anderson testified in relevant part as follows:

Q. What, if anything, did you observe in the vicinity of Lake City Junior High School on that morning [February 9th] as you travelled to your home?

A. The first thing I noticed was there was a white van parked in the westbound lane of Duval Street, that, as I approached it, several cars had, were going around it. There were still two cars behind the van and then my truck. And I was sitting there waiting for the truck to move or waiting for traffic to clear so I could go around it. And on my left, I noticed a young girl, approximately twelve or thirteen years old, dark hair, shoulder length, parted in the middle. Probably the only reason I noticed this girl was she looked very much like one of my nieces.

Q. Was there anyone with the young girl?

A. Yes, sir. With her was a man, approximately early thirties, had brown hair, you know, light to dark brown hair, was full cut of hair. It was one of the things that I really paid any attention to as far as the man was concerned. It was kind of wavy, but it was full cut, you know, really a nice head of hair.

I got the impression that the young girl was either crying or had been crying. The man had a scowl on his face. And I felt like probably the girl had gotten in trouble at the school or misbehaved in some way and had called her father to come pick her up and take her home. And as I was sitting there, watching them, I remember thinking to myself, you know, the daddy is going to take the little girl home and probably, you know, give her a spanking or something like that.

Q. Would you tell us how the girl was dressed, as you recall?

A. She was wearing a pullover football jersey and probably dungarees.

Q. What was the color of the football jersey?

A. It was dark blue.

Q. Did the jersey have any distinguishing marks or characteristics?

A. Yes, sir. It had some letters on it, "63" or "68", red-orange, something like that.

Q. Did the girl appear to be carrying anything?

A. Yes, sir. In her left arm, kind of clutched to her chest like this (demonstrating), was a medium-sized object like, so it could have been a pocketbook or a rolled-up jacket or maybe both. I don't know. The man had her by her left arm, right about the elbow, and he was leading her towards the white van. The little girl was not actually resisting. It was pretty evidence [sic] that, that, you know, she wasn't really anxious to go. They was, from the sidewalk, probably six to ten feet from the sidewalk when I first saw them. They continued to walk to the sidewalk. He stopped—

Q. Did the man have the girl by the left arm during the entire time that you observed them?

A. Yes, sir. They stopped and a car came by, going east, and they crossed in front of the white van. The man opened the door.

Q. Which door did he open?

A. The door on the passenger side. And helped the girl get in the van, slammed the door, and kind of jogged in front of the van, got in the passenger side, and they drove off. R21:4063–65.

Q. Were you able to tell how the man was dressed?

A. Yes, sir. He had a pullover sweater, with a shirt underneath the sweater. I don't recall the exact color of either one of them. The sweater was a neutral color, tan, light grey, something like that. I don't recall the color of his trousers.

Q. You have described the van as being a white van. Can you give any further

description of it. particularly with respect to any windows?

A. All I seen was a, was the very back of it and it had two windows, the rear doors.

Q. Okay. I'm going to have you a photograph, which has been marked for identification as State's Exhibit J. I ask you to examine this photograph and tell us whether or not that photograph is similar to the white van that you observed on the morning of February the 9th in front of the Lake City Junior High School.

A. Yes, sir, it's very similar.

Q. Now, after the person placed the girl in the white van and got in on the driver's side, what happened then?

A. The van drove off, you know, a normal rate of speed. As I said before, there were two vehicles between me and the van. The closest one to the van was a small, dark blue foreign car of some kind. I have no idea what kind.

Q. Did you remain behind the white van?

A. Yes, sir.

Q. And approximately at what distance behind the white van?

A. Two car lengths. We were all fairly close together. Nobody was keeping the proper distance between the vehicles, if I remember correctly. Somewhere between the junior high school and 7th Street, which is roughly seven blocks, six blocks, the small car turned off to the right. I don't recall what street it turned off. And then the van stopped at the red light at 7th Street.

Q. Were you able to observe the driver as he was stopped at the red light there at 7th Street?

. . . .

[A]. Okay. When the van stopped at 7th Street, I could see the silhouette of the driver turn towards the passenger side.

. . . .

Q. Could you see anyone in the passenger side at that point in time?

A. No, sir.

Q. Had the girl been sitting up straight in the seat, do you know of any reason why you could not have seen her at that time?

A. No, sir.

Q. What, if anything, did you see the driver doing?

A. He was gesturing, turned to his right, and moving his head like he was talking, and gesturing with his left hand.

Q. And when you say he was turning to his right, that would have been toward the passenger side of the—

A. Toward the passenger side.

Q. How long after that did you lose sight of the van?

A. Approximately two, two and a half blocks, U.S. 90 veers left and West Duval Street continues straight west.

Q. Mr. Anderson, I'm going to hand you a photograph, which is in evidence as State's Exhibit 1, and I ask you to examine that photograph and tell the members of the jury whether or not you recognize that person depicted.

A. Yes, sir, I do.

Q. Who is that person?

A. It's the young girl I saw at the school.

Q. On the morning of February the 9th?

A. Yes, sir.

Q. I'm going to ask you, Mr. Anderson, if you will look around the courtroom and tell the members of the jury whether or not you can positively identify the man that you observed leading that young girl from the school ground on February the 9th.

A. No, sir, I'm not absolutely certain.

Q. I ask you then to once again to [sic] look around the courtroom and tell the members of the jury whether or not there is anyone in the courtroom who closely resembles the person that you observed leading the young girl to the white van on the morning of February the 9th.

A. Yes, sir, there is.

Q. Would you point that person out, please?

A. The defendant.

.....

Q. Are you aware of any dissimilarities in the appearance between the person that you pointed out in the courtroom and the person that you saw leading the girl to the van on that morning?

A. No, sir, they were very much alike. R21:4068–73.

We hold that Anderson's hypnotically enhanced testimony was not so wholly unreliable that its admission violated Bundy's due process right to a fair trial. Indeed, Anderson's knowledge independent of the hypnosis sessions defeats the inference that the hypnosis was unduly suggestive. The above recitation of the facts makes clear that, prior to going to the police, Anderson strongly suspected that he had seen Leach's abduction—a suspicion he shared with a fishing companion. Upon seeing Bundy on television, Anderson's suspicions grew to a certainty that outweighed his fears of getting involved and sending police on a "wild goose chase." At this point, Anderson went to the police and gave a statement reflecting his thought that a man resembling Bundy had abducted Kimberly Leach. Independent of hypnosis, Anderson recalled that the date of his observation was February 9th.

We also cannot say that the hypnotically enhanced details of Anderson's trial testimony were the product of impermissible suggestions or techniques by the hypnotist. Indeed, the jury heard tapes of the two sessions, received transcripts of those sessions, and heard testimony of an expert witness who addressed what he characterized as the flaws in those sessions. Cross-examination was the avenue with which to attack Anderson's testimony. We have held above that an opportunity for effective cross-examination was available here.

That holding buttresses our conclusion that Anderson's testimony was not so unreliable as to violate Bundy's due process right to a fair trial.

## VIII. *Exclusion of Jurors*

■ Bundy argues that the trial court erred in denying his motion to limit death qualification of the jury, permitting such qualification, and excusing for cause jurors who expressed opposition to the death penalty, notwithstanding their ability to vote for guilt or innocence. Bundy argues that, because of the capital sentencing procedures of Florida law, the rule enunciated in *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), and refined by its progeny does not apply. Bundy asserts that under Florida law the trial judge solely determines whether a defendant receives a death sentence and that the jury renders an advisory opinion only. Bundy concludes that, because the jury has an advisory role only, Florida lacks the usual state interest in excluding jurors who would automatically vote against the death penalty. As a result, Bundy argues that his interest in a jury composed of a cross-section of the community controls and the trial court erred in excusing those jurors who were unalterably committed to vote against the death penalty.

On direct appeal, the Florida Supreme Court held that it was precluded from ruling on this claim because objections as to this claim were not raised in the trial court. *Bundy*, 471 So.2d at 19. The district court held that the claim was procedurally barred and, alternatively, without merit. *See* slip op. at 14.

We conclude that Bundy's claim is without merit.[26] Supreme Court precedent

---

**26.** Bundy argues that the Florida Supreme Court improperly recognized a procedural bar because he raised this issue before the trial court in his motion to limit death qualification of the jury. *See* R159:14,658; app. 54. This motion does not appear to be based on the same ground as the claim raised on direct appeal. Rather, the motion appears directed at the distinction between the trial and sentencing phases. *Cf. Lockhart v. McCree* 476 U.S. 162, 180, 106 S.Ct. 1758, 1768, 90 L.Ed.2d 137 (1986) (state has "entirely proper interest" in obtaining

a single jury that could impartially decide all of the issues in a capital case). In addition, it appears Bundy argued the same rationale to the trial judge. *See* R126:11,375–80. Bundy also suggests in his brief that he voiced timely objections at voir dire. We have examined those passages and it again appears that the objections were directed at the distinction between the trial and sentencing phases. Consequently, it does not appear that Bundy raised the present claim before the trial court. We do not deter-

clearly establishes that a state can exclude for cause a prospective juror whose opposition to the death penalty "would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *See, e.g., Wainwright v. Witt,* 469 U.S. 412, 420, 105 S.Ct. 844, 850, 83 L.Ed.2d 841 (1985) (quoting *Adams v. Texas,* 448 U.S. 38, 45, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581 (1980)). Bundy attempts to avoid the force of this Supreme Court precedent by characterizing the role of the sentencing jury as advisory under Florida law. We disagree. *See Mann v. Dugger,* 844 F.2d 1446, 1449–54 (11th Cir. 1988) (en banc). As a result, *Witherspoon* and its progeny apply to jury selection in Florida cases. Because Bundy admitted in his brief on direct appeal, *see* page 56 of that brief, that the jurors were properly excluded under *Witherspoon,*[27] this claim is without merit as are any claims that "death qualification" violates the fair cross-section or impartial jury requirements of the Sixth Amendment. *See Lockhart v. McCree,* 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986).

## IX. *Frye Test*

Bundy argues that the trial court erred in not conducting a *sua sponte* inquiry into the scientific reliability of fiber and shoe track evidence presented by the state. *See Frye v. United States,* 293 F. 1013 (D.C. Cir.1923) (expert testimony admissible only if based on well-recognized and generally accepted scientific principles). On direct appeal, the Florida Supreme Court noted that Bundy failed to object at trial and thus the claim was procedurally barred. *See Bundy,* 471 So.2d at 20. The district court held that the claim failed pursuant to the procedural default doctrine and, alterna-

tively, was without merit. *See* slip op. at 14–15.

■■■ This claim is not procedurally barred. If the trial court truly had an *independent* duty to conduct a *Frye* test, then Bundy was not obligated to request a *Frye* test or to object at trial to the court's failure to conduct one. Consequently, the Florida Supreme Court improperly refused to consider the merits of this claim, and its mistaken reliance on a procedural bar does not provide an adequate basis for denying federal habeas review.

■■■ Although this claim is not procedurally barred, it is without merit. In substance, Bundy seeks to avoid Florida's contemporaneous objection rule and associated procedural default, *see Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed. 2d 594 (1977), by requiring that the trial court object *sua sponte* to the admission of evidence. In *Wainwright v. Sykes,* 433 U.S. at 86, 97 S.Ct. at 2506, the Supreme Court rejected the suggestion that the trial court had an independent duty to conduct a hearing as to the voluntariness of a defendant's confession. Similarly, we agree that, even assuming that evidence must meet the *Frye* test as a matter of constitutional law,[28] the trial court has no independent duty to challenge the evidence and the admission of the evidence must be challenged by the defendant at trial or not at all.

## X. *Jury View*

Bundy claims he was denied due process when his motion for a jury view of the scene around the school was denied by the trial court. On direct appeal, the Florida Supreme Court held that the trial court did not abuse its discretion. *See Bundy,* 471 So.2d at 20. The district court held that

mine, however, whether this claim is subject to the procedural default doctrine. Rather, we conclude that the claim is without merit.

**27.** Our review of the record indicates that eight prospective jurors were excused because their views on the death penalty precluded them from returning a guilty verdict and/or from voting for the death penalty. *See* voir dire associated with R4:650, R7:1316, R11:2052, R11:2077, R12:2205, R12:2363, R13:2455, and R16:3002. Our review also indicates that their exclusion

accorded with the standards set forth in *Witherspoon* and its progeny.

**28.** Indeed, this Court has intimated that federal *evidence* law does not require that the *Frye* test be met prior to the admission of evidence. *United States v. Hope,* 714 F.2d 1084, 1087 n. 3 (11th Cir.1983). This case, not concerning a federal conviction, presents us with no opportunity to address *Hope's* intimation.

this claim was addressed to an issue of state law and thus was not a basis for federal habeas relief. Alternatively, the district court held that the trial court's ruling did not deny Bundy fundamental fairness. *See* slip op. at 15.

■■■■■ We disagree with the district court's characterization of this claim as addressed to an issue of state law. An evidentiary ruling is a cognizable ground for federal habeas corpus relief if it deprived the state court defendant of fundamental fairness. *See Jameson v. Wainwright,* 719 F.2d 1125, 1126 (11th Cir.1983), *cert. denied,* 466 U.S. 975, 104 S.Ct. 2355, 80 L.Ed. 2d 827 (1984). We agree with the district court, however, that the ruling did not deprive Bundy of fundamental fairness. To constitute a denial of fundamental fairness, the evidence at issue must be crucial and highly significant. 719 F.2d at 1127; *see Williams v. Kemp,* 846 F.2d 1276, 1282 (11th Cir.1988). In the present case, the scene had been significantly altered because of the construction of a four-lane highway. In addition, photographs of the scene were admitted into evidence, and cross-examination as to the scene was allowed. Consequently, denying the jury an actual view of the scene cannot be said to have deprived Bundy of a fundamentally fair trial.

## XI. *Evidence of Flight*

■■■■■ Bundy claims he was denied due process when his motion in limine to exclude evidence of flight was denied by the trial court and when the trial court instructed the jury regarding the evidence of flight. On direct appeal, the Florida Supreme Court relied on federal cases binding on this panel and held that the evidence was properly admitted and that the related instruction was proper. *See Bundy,* 471 So.2d at 20–21. The district court noted that this claim raised state-law issues and thus was not a basis for federal habeas corpus relief.[29] Alternatively, the district court held that the evidence was properly

admitted and that the jury instruction did not render the trial fundamentally unfair. *See* slip op. at 15–16.

The state presented evidence of two instances of flight by Bundy. The first instance occurred on February 11, 1978 (two days after the abduction of Kimberly Leach) at 1:47 a.m. in Tallahassee, which is approximately 100 miles west of Lake City. In this instance, after being stopped by a police officer, Bundy successfully fled. The second instance occurred on February 15, 1978 (six days after the abduction of Kimberly Leach) at approximately 1:30 a.m. in Pensacola, which is approximately 200 miles west of Tallahassee and 300 miles west of Lake City. After being stopped by a police officer, Bundy began to flee down a street, but was caught and arrested within a few minutes. The trial judge permitted evidence of both instances of flight and, prior to the jury's deliberations, instructed the jury as follows:

> You are instructed that the flight of the defendant is a circumstance which may be taken into consideration with all other facts and circumstances in the evidence and, if you, the jury, believe and find from the evidence beyond every reasonable doubt that the defendant fled for the purpose of avoiding arrest and trial under the charges herein, you may take this fact into consideration in determining guilt or innocence.

R35:6939–40. We find no error in the admission of the evidence of flight and no error in the trial court's instructions as to that evidence.

## XII. *Doubling of Aggravating Circumstances*

■■■■ Bundy argues that constitutional error occurred when the trial court relied on Bundy's conviction in Utah for aggravated kidnapping to find two aggravating circumstances: (1) Bundy was under a sentence of imprisonment when he committed the present crime and (2) Bundy previously had been convicted of a violent crime. On

---

**29.** As set forth above, an evidentiary ruling is a cognizable ground for federal habeas corpus relief if it deprived the state court defendant of fundamental fairness, that is, the improperly admitted evidence was crucial and highly significant.

direct appeal, the Florida Supreme Court applied the test enunciated in *Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932), and rejected Bundy's claim. *See Bundy*, 471 So.2d at 22.

The district court recognized the Florida Supreme Court's reliance on *Blockburger* and concluded it was "convinced that the [Florida] Supreme Court's decision on this issue [was] correct." [30] Slip op. at 16. We agree that *Blockburger* renders Bundy's claim without merit. In *Blockburger*, the Supreme Court stated that "the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." 284 U.S. at 304, 52 S.Ct. at 182. In the present case, each aggravating circumstance clearly has an element different from the other.

### XIII. *Penalty for Requesting Jury Trial*

■ Based on the state's original agreement to a life sentence in this case,[31] Africano filed a motion that would have prevented the court from convening the penalty phase and from returning a death sentence. The motion stated that Bundy was unconstitutionally forced to risk death in order to exercise his right to a jury trial. The trial judge denied the motion. Although Bundy challenged this denial in his brief on direct appeal, the Florida Supreme Court did not address it.

In his federal habeas petition, Bundy claimed that the trial court erred in denying his motion to enter a life sentence on the verdict and to prohibit the penalty phase of trial. The district court observed that Bundy "essentially concedes that this ground is procedurally barred," and, alternatively, held the claim without merit. *See*

slip op. at 16–17. Although this claim is not procedurally barred,[32] we agree that the claim is without merit. There is no hint in the record that Bundy received a heavier sentence after trial as a result of judicial vindictiveness or punitive action. *See Hitchcock v. Wainwright*, 770 F.2d 1514, 1518–20 (11th Cir.1985) (en banc), *rev'd on other grounds*, —— U.S. ——, 107 S.Ct. 1821, 95 L.Ed.2d 347 (1987).

### XIV. *Clemency Hearing*

■ Bundy argues that he was denied his right to apply for executive clemency in violation of the Eighth and Fourteenth Amendments. The Florida Supreme Court, *see Bundy*, 497 So.2d at 1211, and the district court, *see* slip op. at 17, held this claim without merit. We affirm the district court, but do not share its reasoning.

We begin our analysis of the procedural due process claim by determining whether Bundy has a protected liberty interest in being accorded a hearing for executive clemency. "Liberty interests protected by the Fourteenth Amendment may arise from two sources—the Due Process Clause itself and the laws of the States." *Hewitt v. Helms*, 459 U.S. 460, 466, 103 S.Ct. 864, 868, 74 L.Ed.2d 675 (1983). This Circuit's predecessor has held that such a liberty interest does not arise from the Due Process Clause itself. *See Spinkellink v. Wainwright*, 578 F.2d 582, 617–19 (5th Cir.1978), *cert. denied*, 440 U.S. 976, 99 S.Ct. 1548, 59 L.Ed.2d 796 (1979). Accordingly, we turn to the Florida Rules of Executive Clemency. *See Sullivan v. Askew*, 348 So.2d 312, 319–25 (Fla.) (setting forth clemency procedures), *cert. denied*, 434 U.S. 878, 98 S.Ct. 232, 54 L.Ed.2d 159 (1977).

---

**30.** Because 28 U.S.C. § 2254(d) does not accord a presumption of correctness to a state court's determination of law, we read the district court as independently agreeing with the Florida Supreme Court's analysis.

**31.** Although the state did agree to life sentences in this case and the Leon County case, Bundy appeared in open court at the joint plea proceeding, challenged the effectiveness of his counsel, and made a motion for replacement of

counsel. At this point, the state withdrew the plea offer for fear that Bundy later would challenge his guilty pleas by claiming he had received ineffective assistance of counsel.

**32.** We do not fault the district court for its statement. Bundy erroneously stated in his habeas petition that the claim had not been raised on direct appeal.

In *Hewitt,* the Supreme Court observed that the mere enactment of regulations does not automatically give rise to a liberty interest, especially if the regulations are nothing more than guidelines for the exercise of executive discretion. 459 U.S. at 471, 103 S.Ct. at 871. The Court recognized, however, that a liberty interest is present when the regulations are of an "unmistakably mandatory character" and require "specific substantive predicates." *Id.* at 471–72, 103 S.Ct. at 871.

Florida's clemency procedures do not satisfy either requirement. *Cf. Sheley v. Dugger,* 833 F.2d 1420, 1424 (11th Cir.1987) (Florida "rules and regulations concerning administrative segregation and close management create for inmates a liberty interest in remaining in the general prison population"); *McQueen v. Tabah,* 839 F.2d 1525, 1527–29 (11th Cir.1988) (following *Sheley* ). First, the clemency procedures do not unmistakably indicate that a prisoner sentenced to death is entitled to a clemency hearing. Rule 7, a special rule for executive clemency in capital cases, provides that "[t]he Governor or any member of the Cabinet, after reviewing a certified copy of the conviction and sentence, *may* request the Florida Parole and Probation Commission to make an appropriate investigation, inquiring into any factors relevant to commutation." Although Rule 7 sets forth required procedures, these procedures are required only after the discretionary request to the Commission. *See also Sullivan,* 348 So.2d at 318 (England, J., specially concurring) (procedures are required "once triggered"). Second, no specific substantive predicates govern this discretion; the decision whether to grant clemency is wholly a matter of executive discretion. *Sullivan,* 348 So.2d at 314–16; Fla. Const. Art. IV, § 8. The clemency rules do not require the Governor to make any factual findings in order to deny clemency to a capital defendant.

▮▮▮ Finally, Bundy's claim that the lack of a clemency hearing violates his Eighth Amendment right is without merit. This is not the situation where a state prohibits executive clemency. *See Gregg v. Georgia,* 428 U.S. 153, 200 n. 50, 96 S.Ct. 2909, 2937–38 n. 50, 49 L.Ed.2d 859 (1976) (opinion of Stewart, Powell, and Stevens, JJ.) (prohibiting executive clemency "would be totally alien to our notions of criminal justice"). In addition, the concern derived from the Eighth Amendment regarding capital cases focuses on the judicial processes of trial and appellate review, not on the discretionary state process (i.e., executive clemency) succeeding them. *See Spinkellink,* 578 F.2d at 619 & n. 45.

## XV. *Pretrial Publicity*

Bundy argues that his jury was both presumptively and actually prejudiced on account of adverse pretrial publicity concerning his conviction in the Leon County case. By statutory choice of permissive venue, venue initially was in Suwannee County. (Lake City is located in Columbia County.) After the start of voir dire in Suwannee County, the trial court granted Bundy's motion for a change in venue and moved the case to Orange County. The trial court refused to grant Bundy another change of venue, or abatement in the trial, even though Bundy contended that the jurors in Orange County were as equally prejudiced as the jurors in Suwannee County. The Florida Supreme Court, *see Bundy,* 471 So.2d at 19–20, and the district court, *see* slip op. at 17–19, held this claim without merit. On appeal, Bundy argues that the district court erred in denying him an evidentiary hearing on this claim.

▮▮▮ Jury prejudice can be presumed from pretrial publicity if that publicity is sufficiently prejudicial and inflammatory and if it saturated the community where the trial was held. *Murphy v. Florida,* 421 U.S. 794, 798–99, 95 S.Ct. 2031, 2035–36, 44 L.Ed.2d 589 (1975); *Rideau v. Louisiana,* 373 U.S. 723, 726–27, 83 S.Ct. 1417, 1419–20, 10 L.Ed.2d 663 (1963); *Coleman v. Kemp,* 778 F.2d 1487, 1490 (11th Cir.1985), *cert. denied,* 476 U.S. 1164, 106 S.Ct. 2289, 90 L.Ed.2d 730 (1986). This principle is rarely applicable and reserved for extreme situations where pretrial publicity renders "virtually impossible a fair trial by an impartial jury drawn from the community."

*Mayola v. Alabama,* 623 F.2d 992, 997 (5th Cir.1980), *cert. denied,* 451 U.S. 913, 101 S.Ct. 1986, 68 L.Ed.2d 303 (1981).

■ We hold that the coverage of the Leon County trial,[33] although extensive, does not satisfy the heavy burden associated with presumed prejudice. In support of his motion for a change in venue or abatement of prosecution, Bundy presented the testimony of local television personnel. *See* R6:1159–98, R7:1202–18. The public television station had broadcast half-hour summaries of the Leon County trial. These summaries were factual accounts; the station was prohibited by law from offering editorial comment. At the time of jury selection in January 1980, the station had not broadcast anything about Bundy since the conclusion of the Leon County trial in late July 1979. Although the commercial television stations provided extensive coverage of the Leon County trial, the coverage was factual in nature and not designed to inflame or prejudice the public. In addition, prior to the verdict, these stations did not broadcast editorials about whether the defendant was guilty in that case. Bundy also presented newspaper articles from the local newspaper. *See* R12:2222–24. Again, these articles are largely factual in nature. Consequently, unlike *Coleman,* the coverage of the Leon County case was not infested with inflammatory and prejudicial remarks from the police and prosecutors. *See also Murphy,* 421 U.S. at 802, 95 S.Ct. at 2037 (news articles were largely factual in nature); *United States v. Klacker,* 811 F.2d 555, 556 (11th Cir.1987) ("The news reports detailing appellant's flight from justice were largely factual reports, devoid of inflammatory material.").

■ Likewise, we are unpersuaded by a public opinion poll proffered by Bundy in support of his motion. The poll, conducted among residents of Orange County, showed that 98% of those who responded indicated their familiarity with the name Bundy. *See* R7:1237. Of that number 58% stated that they knew Bundy had been involved in the Leon County case. Of that number, 31% believed that Bundy's conviction in that case strongly indicated that he was guilty in the present case. *See id.* at 1240. Although publicity concerning a defendant's involvement in other crimes is relevant in presuming jury prejudice, especially if the defendant's involvement in that crime is inadmissible in the guilt/innocence phase, *Murphy* stands for the proposition that prejudice is not presumed simply because the defendant's criminal record is well publicized. Thus, even assuming that the methodology of the public opinion poll is such that it accurately reflected the attitude of Orange County residents, the poll does not demonstrate that the community was so predisposed to Bundy's guilt in the present case that prejudice must be presumed.

■ Nor can we say that Bundy has demonstrated actual prejudice in the entire venire. *See Irvin v. Dowd,* 366 U.S. 717, 727, 81 S.Ct. 1639, 1645, 6 L.Ed.2d 751 (1961). We have carefully reviewed approximately 19 volumes of voir dire. We note that the trial court propounded general questions to each set of prospective jurors, the panels ranging from eleven to fifteen persons. As one of the general questions, the trial court requested that prospective jurors raise their hands to indicate if they had heard of the defendant, but that they not reveal the source or extent of their knowledge. Thereafter, those prospective jurors who remained after general questioning were individually questioned by the trial court, one prosecutor, and one defense attorney. No other prospective juror was present during this individual questioning. Our review of the record indicates that as part of this individual questioning the trial court permitted a searching inquiry into knowledge and thoughts about the defendant.

Our review of the record indicates that 172 prospective jurors were called and 56

---

**33.** We reject any notion that press coverage related to the evidence in the present case or related to Bundy's activities in other states satisfies the heavy burden associated with presumed prejudice. Our review of the voir dire buttresses this conclusion; few prospective jurors had knowledge of the details of the present case or of Bundy's out-of-state activities.

were excused for reasons relating to health, family, employment, or school. Of the 116 remaining prospective jurors, 42 were excused because they could not (1) be impartial based upon their extensive knowledge of the Leon County case, (2) set aside preconceived notions of guilt, and/or (3) could not accord Bundy a presumption of innocence.[34] Of the remaining 74 jurors, a small minority also stated that they had a preconceived notion of guilt. Consequently, we cannot say that Bundy suffered actual prejudice from the entire venire.

Before we examine whether Bundy has demonstrated actual prejudice regarding the trial jury as a whole, we examine Bundy's challenge to an individual juror. The Supreme Court has recognized that the question of the partiality of an individual juror is one of historical fact to which the presumption of correctness of a state court's factual findings under 28 U.S.C. § 2254(d) applies. *Patton v. Yount*, 467 U.S. 1025, 1036, 104 S.Ct. 2885, 2891, 81 L.Ed.2d 847 (1984). "Thus the question is whether there is fair support in the record for the state courts' conclusion that the juror[ ] here would be impartial." *Id.* at 1038, 104 S.Ct. at 2892.

 We conclude that there is fair support in the record for the trial court's conclusion[35] as to this individual juror. This juror, the twelfth juror selected and eventually the jury foreman, was pre-press manager of the local newspaper. In response to the trial court's questions, he stated that he understood that the defendant was entitled to be tried on the evidence presented in the present case alone, that he would follow the trial court's instructions as to the law, that he would accord the defendant a presumption of innocence and hold the state to its burden of proof, that he would not require the defendant to take the stand, and that he would set aside any opinion or impression he had about the defendant. *See* R18:3455–58. Assuming a guilty verdict, he stated that he was not committed to voting automatically for the death penalty or life imprisonment. *Id.* at 3465. He again stated that the defendant need not take the stand, the defense need not prove the defendant not guilty, and that the burden rested on the state. *Id.* at 3466–67.

On questioning by Africano, *see generally id.* at 3473–89, the juror stated that he knew Bundy was convicted of murder in Miami of "the Tallahassee girls" and that "it sounded like a pretty gory case" and "some brutal murders." He knew Bundy was sentenced to death. Unlike most prospective jurors, he recalled the bite-mark evidence from that case, although he stated, "I believe that was the Bundy case." He guessed that death was by bludgeoning and that there was more than one murder. Unlike most prospective jurors, he recalled that Bundy had escaped from prison in Colorado. He knew that Bundy "is highly intelligent and he had some law background or something somewhere along the line." He did not recall if co-workers had reached a consensus of Bundy's guilt prior to the Leon County verdict, but said that family and friends thought Bundy was guilty. Twice, he stated that he had no thoughts as to Bundy's guilt prior to the verdict.[36] After conviction in the Leon

---

34. Three prospective jurors could not accord a presumption of innocence to a defendant in general. In addition to the 12 jurors and three alternates, 36 were excused on the basis of peremptory challenges, eight on the basis of *Witherspoon*, five for hearing improper comments of or engaging in improper discussion with other prospective jurors, four because of their reaction to the victim's age or the planned introduction of photographs into evidence, one because of meeting the victim's father, one because of being in Lake City at the time of the crime, and one because of believing that imposition of the death penalty was automatic upon conviction based on the facts alleged in the indictment.

35. The trial court rejected the defendant's challenge for cause: "The Court finds that this prospective juror is competent to serve. It has not been shown that he has partiality and as shown by his total testimony, he is able to put aside anything he might have heard or any feelings he might have, and he is competent to serve." R18:3507.

36. Q. Did you ever voice or feel that he was guilty before the verdict was handed down?
A. No. I'm one of the rare few that, without seeing or being there when the evidence was given, I really don't think you can judge.
. . . .

County case, his feelings were "[n]ot too good towards Mr. Bundy." He stated that he still felt that way, but that he would listen to the evidence in the present case.[37] Upon further questioning, the juror adhered to his earlier stated positions.[38] Based upon our examination of the record, we hold that there is fair support for the trial court's conclusion.

We proceed to examine whether Bundy has demonstrated actual prejudice regarding the trial jury as a whole. In this context, the Supreme Court has questioned whether the "fairly supported by the record" standard of 28 U.S.C. § 2254(d) supplanted the "manifest error" standard enunciated in *Irvin. Patton v. Yount*, 467 U.S. at 1031 n. 7, 104 S.Ct. at 2889 n. 7.

> Q. Okay. And didn't that "he must have done something," doesn't that give you any tendency to feel that he must have been guilty of something?
> A. No. It aroused a lot of curiosity, but I can't judge anyone guilty just because there is a lot of publicity.
> R18:3479.

37. Q. The feelings that you had about Mr. Bundy after the trial in Miami, which you have described as not being very good, do you still carry those feelings with you?
> A. Sure.
> Q. You do?
> A. (Nods head affirmatively)
> Q. Well, how do you feel about him as he sits there now?
> A. He is a convicted murderer.
> Q. Okay. Does that make you feel anything about the charges in this case?
> A. Not in this case.
> Q. Does the fact that the State of Florida has brought an indictment against him and prosecuting him make you feel that he is in some way guilty of that charge?
> A. Not of this charge.
> Q. The fact that you know he is a convicted murderer, as you put it, doesn't make you feel any less like giving him all the presumptions of innocence that the Court has instructed you about?
> A. No. The State has to prove that he is guilty in this particular case.
> Q. Okay. But how are you going to take out of your mind the bad feelings you have about Mr. Bundy, the fact that you described him as a convicted murderer, and then just look at that evidence totally and completely objectively?
> . . . .
> A. He is innocent in this case until the State of Florida proves him guilty. As a juror, I have to listen to the evidence in this case. . . .

The Court, however, did not resolve the question because it concluded that the defendant had not satisfied the "manifest error" standard. *Id.* at 1032 n. 7, 104 S.Ct. at 2889 n. 7. Because we conclude that Bundy has not satisfied *Irvin*'s standard, we also do not determine whether Section 2254(d) has superseded that standard.

We have already set forth the relevant voir dire of the twelfth juror. We now summarize the individual voir dire of the other eleven jurors:

Juror No. 1 (R6:1017–1049): She stated that she could follow the trial court's instructions. She knew that Bundy was on trial for some murders in the northern part of Florida. She believed he was convicted,

> Whether I like him or not, what I think about him in the past has to have nothing to do with this case. I will attempt to do that.
> Q. I understand you will attempt to do that, but, because I'm not going to get a chance to discuss with you later, and, once you're passed on as a juror, it's too late, if you don't think that you really can do it. This is why we have this opportunity to deal with this at this point in time. And as Mr. Bundy's lawyer, I need to know how you feel about him. Are you so opinionated about him personally that it might affect your perception about the evidence in this case?
> A. Not as far as this case is concerned.
> R18:3483–85.

38. Q. Is what you know and, as a person, feel about Mr. Bundy going to make the State's burden any less in proving guilt beyond and to the exclusion of every reasonable doubt?
> A. No.
> Q. If, at the conclusion of the State's case or all of the evidence in this case, you feel that the State hasn't quite met its burden, but you do have a reasonable doubt, that this defense has not come forward with any evidence or Ted Bundy did not take the stand and testify and tell you he didn't do it, is what you know about him and feel about him personally, is that going to make you resolve that reasonable doubt against him?
> A. No.
> Q. If you resolve in your own mind, at the conclusion of all of the evidence, that the State has not met its burden and you feel and find in your own mind that Ted Bundy is not guilty, would you hold firm in that resolve?
> A. Sure.
> Q. Even if you were a majority of one of twelve people?
> A. (Nods head affirmatively).
> R18:3488–89.

but did not know the sentence. No challenge for cause was made.

Juror No. 2 (R6:1080–1116): He stated that he could follow the trial court's instructions. He had heard Bundy's name before, but could not recollect why. No challenge for cause was made.

Juror No. 3 (R8:1482–1530): She stated that she was not sure that she had a fixed opinion regarding guilt/innocence, but that she would follow the trial court's instructions. She stated that she was not sure if she had an open mind regarding hypnosis and that she had mixed feelings about the death penalty. Although she "may even have the wrong thing," it seemed that Bundy was involved in the crime involving three girls in upstate Florida. She had formed a negative opinion about Bundy, but could fairly and impartially judge the evidence, although there might be a glimmer of a doubt that she could do that. She thought she would require some evidence tending to show innocence, even though there is a presumption of innocence. She thought she might be influenced by the fact that Bundy did not take the stand. However, she would just have to keep reminding herself of the instructions of the court. The trial court found a firm indication of impartiality and denied the motion to excuse for cause.

Juror No. 4 (R9:1686–1729): He stated that he could follow the trial court's instructions. He knew that Bundy was found guilty of murder in the previous trial and sentenced to death. He knew nothing of Bundy's background. He stated that what happened before would not have any effect on the guilt/innocence in the present case. The trial court found that the prospective juror could be impartial and denied the motion to excuse for cause.

Juror No. 5 (R10:1974–98, R11:2002–12): He stated that he could follow the trial court's instructions. He heard Bundy's name mentioned around his workplace. He knew Bundy was tried for something in northern Florida, but he did not know the charges or the outcome of the trial. He knew nothing of Bundy's background. The trial court credited the truth of the pro-

spective juror's testimony and denied the motion to excuse for cause on that basis.

Juror No. 6 (R11:2013–51): He stated that he had no preconceived notion of Bundy's guilt or innocence and that he could follow the trial court's instructions. He knew that Bundy was tried, convicted, and sentenced to death in Miami for the murders of two sorority sisters at Florida State University. Unlike most prospective jurors, he recalled the dentist's testimony about the bite marks and recalled that Bundy was a law student out west and possibly wanted out there. Prior to the verdict in the Leon County case, he had formed an opinion that Bundy was guilty. He stated that he had no opinion about Bundy personally and that his knowledge would not influence his decision because the present case was a totally different case. He stated that he believed in the notion of innocent until proven guilty. The trial court denied the motion to excuse for cause.

Juror No. 7 (R14:2698–2737): She stated she could follow the trial court's instructions. She was dubious about hypnosis, but could consider the testimony. She read the newspaper once she knew Bundy was coming to Orlando for trial. She learned that Bundy had been tried and found guilty. She did not know what sentence was imposed. The trial court denied a motion to excuse for cause.

Juror No. 8 (R14:2737–80): She stated that she could follow the trial court's instructions. She stated that she first heard of Bundy in the context of jury selection for this case. She expressed no knowledge of the Leon County trial. No challenge for cause was made.

Juror No. 9 (R16:3102–46): She stated that she could follow the trial court's instructions. She knew that Bundy was convicted of murder in the earlier trial, but did not know if any sentence was imposed on Bundy. No challenge for cause was made.

Juror No. 10 (R16:3191–98, R17:3202–27): She stated that she had no feelings or opinions about the defendant that would prevent her from serving as a fair and impartial juror. She stated that she could follow the trial court's instructions. She

knew there was a prior trial, but did not know where it was held. No challenge for cause was made.

Juror No. 11 (R17:3227-52): She stated that she could follow the trial court's instructions. She did not have a television, did not get the newspaper, and heard of Bundy through conversations only. She did not recognize Bundy when she came to court and thought one of the defense attorneys was Bundy. She stated that she had never heard of Bundy before reporting for jury duty. No challenge for cause was made.

Based upon the composition, as summarized above, of the trial jury as a whole, we hold that Bundy has not shown that the trial court committed "manifest error." Consequently, we reject Bundy's claim that he suffered presumed or actual prejudice as a result of pretrial publicity.

Accordingly, we hold that none of the grounds asserted by Bundy for federal habeas corpus relief merits the granting of his petition. Therefore, we AFFIRM the district court.